| | |
|---|---|
| Eunice Anderson, | ) |
| Talley Saunders, | ) |
| Edith Saunders, | ) |
| Jerry Boney, | ) |
| Annie Hayes, | ) |
| Mae Mazyck, | ) |
| Nicholas Woodard, Sr., | ) |
| Evelyn Woodard, | ) |
| Dominique Woodard, | ) |
| Nicholas Woodard, Jr., | ) |
| Shatinah Woodard, and | ) |
| Harvey Tate, | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
|      v. | ) |
| | ) |
| Murphy-Brown, LLC, | ) |
| | ) |
|      Defendant. | ) |

## SECOND AMENDED COMPLAINT

Plaintiffs hereby file their Second Amended Complaint against the Defendant Murphy-Brown, LLC ("Murphy-Brown") and allege as follows:

### I. INTRODUCTION

1.      The Plaintiffs are residents of Pender County, North Carolina.  During the pertinent times, they have resided on and used land in proximity to two adjacent swine operations which hold thousands of hogs owned by the Defendant: the Crooked Run Farm ("Crooked Run") licensed to hold up to 4,200 of Defendant's hogs and Willow Creek Farm ("Willow Creek") which can hold 1,446 of Defendant's sows.  Because of their size, they each are termed a Concentrated Animal Feeding Operation ("CAFO").

1

2. Hogs generate three times or more manure than humans. The Defendant's hogs at the CAFO facilities generate many times more sewage than entire nearby towns. Yet Defendant has failed to take adequate steps to manage the number of hogs at the sites or dispose of the millions of gallons of manure that come from the hogs. While placing thousands of its hogs at CAFO sites, Murphy-Brown has failed to take appropriate steps to eliminate the obnoxious recurrent odors and other causes of nuisance. The hogs have impaired the Plaintiffs' use and enjoyment of their properties.

3. In addition and as an independent cause of the nuisance, the presence of Defendant's hogs has caused periodic swarms of flies, other insects, and other pests. Large black flies periodically descend upon Plaintiffs' properties, ruining and interfering with family activities, cookouts and other outdoor activities. Other insects such as gnats come onto Plaintiffs' land. The flies get stuck to windows and get inside the homes. Other vermin may come onto the properties. These insects and pests are "vectors" for disease.

4. Further, as another independent cause of the nuisance, Defendant's hogs necessitate very large trucks crawling up and down the streets outside of the Plaintiffs' homes. These are often narrow and even unpaved country lanes, which normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out both live and dead hogs. These trucks often go by Plaintiffs' homes in the dead of night and they cause noise, dust, liquid spilling from the trucks and bright lights of their headlights. They are the opposite of what one would expect to see going by one's home in such a rural country neighborhood.

5. Defendant is a large enterprise with the ability and the resources to reduce and end the nuisance. Defendant's parent company Smithfield Foods, Inc. ("Smithfield") was sold to

a multinational corporation, Shuanghui, in late 2013 in a transaction estimated to have a value in excess of $7 billion, and reported record profits for the first quarter of 2014. Smithfield reported sales for the first quarter of 2014 of $3.4 billion and net income of $105.3 million. Defendant clearly has the resources to eliminate the nuisance yet has not done so.

6.    The use of the outmoded "lagoon and sprayfield" system has been banned for new farms in North Carolina for years, and many measures exist to reduce the nuisance from existing facilities. Defendant has the means and ability to correct the nuisance but has failed to do so negligently and improperly.

## II.   PARTIES

### A.   Plaintiffs

7.    Plaintiff **Eunice Anderson** is a resident of North Carolina who resides at 5709 NC Highway 11, Willard, NC.

8.    Plaintiff **Talley Saunders** is a resident of North Carolina who resides with his wife, Edith Saunders, at 5901 NC Highway 11, Willard, NC.

9.    Plaintiff **Edith Saunders** is a resident of North Carolina who resides with her husband, Talley Saunders, at 5901 NC Highway 11, Willard, NC.

10.    Plaintiff **Jerry Boney** is a resident of North Carolina who resides at 5878 NC Highway 11, Willard, NC.

11.    Plaintiff **Annie Hayes** is a resident of North Carolina who resides at 325 Red Tip Lane, Willard, NC.

12.    Plaintiff **Mae Mazyck** is a resident of North Carolina who resides at 6031 NC Highway 11, Willard, NC.

13.     Plaintiff **Nicholas Woodard, Sr.,** is a resident of North Carolina who resides at 6061 NC Highway 11, Willard, NC, with his wife, Evelyn Woodard, and their children: Dominique, Shatinah, and Nicholas, Jr.

14.     Plaintiff **Evelyn Woodard** is a resident of North Carolina who resides at 6061 NC Highway 11, Willard, NC, with her husband, Nicholas Woodard, Sr., and their children: Dominique, Shatinah, and Nicholas, Jr.

15.     Plaintiff **Dominique Woodard** is a resident of North Carolina who resides at 6061 NC Highway 11, Willard, NC.

16.     Plaintiff **Nicholas Woodard, Jr.,** is a resident of North Carolina who resides at 6061 NC Highway 11, Willard, NC.

17.     Plaintiff **Shatinah Woodard** is a resident of North Carolina who resides at 6061 NC Highway 11, Willard, NC.

18.     Plaintiff **Harvey Tate** is a resident of North Carolina who resides at 5500 NC Highway 11, Willard, NC.

**B.    <u>Defendant</u>**

19.     Defendant **Murphy-Brown, LLC** is a limited liability company organized under the law of Delaware.  Murphy-Brown's sole member is John Morrell & Company ("Morrell"), a corporation incorporated under the law of Delaware and with its principal office located at 200 Commerce Street, Smithfield, VA 23430.  Morrell is wholly-owned subsidiary of Smithfield, a corporation incorporated under the law of Virginia and with its principal office located at 200 Commerce Street, Smithfield, VA 23430.  During the pertinent times, Murphy-Brown has conducted business in numerous states including North Carolina.

4

### III.  JURISDICTION AND VENUE

20.    The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

21.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action in which the matter in controversy, inclusive of monetary damages and the value of injunctive relief, exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

### IV.  FACTUAL BACKGROUND

#### A.    Background Regarding the Plaintiffs.

23.    During the pertinent times, the Plaintiffs have suffered injury and harm as a direct result of the tens of thousands of swine placed near their homes by Murphy-Brown.  Defendant's hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floor into holding ponds below the floors that hold raw feces and urine.  Stench rises from below the floor and from throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure can be sent out by large fans set in hog shed walls or by other means.

24.    The urine and feces go into giant holding ponds outdoors from which it evaporates and may leak and spill.  Because Murphy-Brown does not cover the cesspools they are free to evaporate odor into the air and attract flies.  The slurry or liquid containing the urine and feces is also sprayed into the air and onto fields around the hog sheds causing odorous fecal

and urinous mist to drift through the air, go onto neighboring lands, and moisture and matter to fall and puddle on the soil so that more odor rises off it.  Sites must spray large quantities or else the "lagoons" will overflow.   Murphy-Brown refuses to truck manure away by tanker truck although it has the capacity to do so.  One or more Plaintiffs have witnessed spraying and spray mist and the spraying regularly occurs and causes sickening stench.  The sites also breed and attract flies and other insects.  Dead hogs are placed in "dead boxes" where they rot until picked up by "dead trucks."  Large hog trucks carry hogs into and out of the facilities.  All of these activities cause odor, annoyance, dust, noise and loss of use and enjoyment of homesteads.  The stench and associated nuisance also embarasses and humiliates the Plaintiffs.

25.     Plaintiffs have suffered episodes of noxious and sickening odor, onslaughts of flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts, gardening, lawn chores, drifting of odorous mist and spray onto their land, inability to keep windows and doors open, difficulty breathing and numerous other harms.

26.     All Plaintiffs have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance from the hog sites and large hog trucks that pass up and down their rural roads.  They variously engage in keeping windows and doors closed and running air conditioner during mild weather, caulking and employing other sealants on windows and doors, purchasing cans of spray insecticides, paying to have their yards sprayed with pesticides, purchasing flypaper strips, purchasing bottled water so as to avoid using well water, purchasing scented candles or incense, and purchasing air fresheners, purifiers, and deodorizers.

27.     Overhead photos show how the general location of the Plaintiffs' homes relative to the Willow Creek and Crooked Run facilities reflects a close proximity.

### i. **Eunice Anderson.**

28.     Plaintiff Eunice Anderson was born and raised on the property on which she currently resides.  To the best of her recollection, her father bought the property in the 1930s and built the home in which she was raised.  After many years of working hard and saving their money, Ms. Anderson's parents built the home in which she currently lives.

29.     After more than a 40-year career as a school teacher, she retired in or about 1996 and moved in with her ailing mother at her homeplace to help care for her.  Upon her mother's death in 2010, Ms. Anderson inherited the property and has continued living there.  Ms. Anderson, now 80 years of age and having no children herself, has already made arrangements for her home and property to be left to her church on her death.  She is concerned, however, that he property would be worth considerably more if not for the Facilities being so close and is upset that the only property she has to leave to her church can be so overrun with odors coming from the Defendant's swine.  Both the Crooked Run and Willow Creek facilities are within a short distance of her home.

30.     Having been born and raised on this property, Ms. Anderson knows very well the impact the swine have had on her property.  The odors, flies, and presence of large hog trucks passing by on a frequent basis were not in existence prior to the Facilities' construction.  The odor is particularly bad around the time it has been raining in the area.

31.     To help combat the odor problem presented by the Defendant's swine, Ms. Anderson keeps her windows closed and frequently uses air freshener inside her home.

32.     Ms. Anderson is concerned that the Defendant's swine have had an irreversible impact on the quality of her drinking water, as it often has a foul odor.  For that reason, she only buys her drinking water in bottles.

### ii. **Edith and Talley Saunders.**

33.     Talley Saunders and his wife, Edith, live in his family home at 5901 NC Highway 11 in Willard, NC.  The entrance to the Crooked Run facility is directly across the street from their home.  Therefore, they frequently see large and noisy hog trucks entering and exiting from the facility, which have frequently woken them up of a night or early morning.

34.     Mr. Saunders was raised on the property where the Crooked Run facility now sits. In or about 1975, his parents purchased the property on which he currently resides.  His home is directly across the street from the entrance to the Crooked Run facility.  Although very close to the hog barns at each facility, the fields on which the feces and urine from Defendant's swine is sprayed are even closer to their home.

35.     Mr. and Mrs. Saunders have been significantly affected and bothered by the nuisance created by the Defendant's swine ever since they have been housed at the Facilities. These conditions were not present on the property before the Facilities began housing Defendant's swine in 1990 and 1991, but have been recurrent ever since.

36.     They are frequently denied the use and enjoyment of their property due to the nuisances caused by the Defendant's swine.  As a recent example, the Saunderses wanted to have a celebratory cookout for their grandson who was graduating from high school this past June. Due to the unpredictable nature of the foul odor, they decided against having it on their family homeplace for fear that others may not want to come and instead had it in a public park.  Mr. Saunders also recalls that one day recently in July 2014, the odor and flies were so bad while he was doing yard work, he had to wear a face mask to lessen its effect.

37.     A further example of the nuisance is how one Saturday in July 2014, Mr. and Mrs. Saunders saw a large hog truck passing by their residence, leaking what appeared to be effluent

8

and entering the Crooked Run facility, then leaving the facility approximately 30 minutes later. "Dead trucks" also present a concern for them. On frequent basis, large dump trucks enter the Facilities and leave with the dead hogs owned by Defendant. When these trucks enter and exit, they leave behind them a trail of foul odor that can linger for some time after.

38.     The Saunderses also have concerns that their well water quality has been affected by the Defendant's swine. Their water has somewhat of a foul odor to it and for this reason they always buy bottled water for drinking and cooking.

### iii. **Jerry Boney**.

39.     Across the street from Mr. and Mrs. Saunders, Plaintiff Jerry Boney has lived in his home at 5878 Highway 11 since approximately 1986 with his wife and children.

40.     His property is directly in front of and adjacent to the Crooked Run facility, separated only by a ditch. He can see the hog houses and spray fields at the Crooked Run facility from his backyard. The open-air lagoon where the waste produced by Defendant's swine is held is only about 450 yards from his house. In between the lagoon and his home is the large spray field where the waste is sprayed into the air and on the field just behind his home.

41.     The driveway of the Crooked Run facility is close to and is visible from his front yard. He and his family can see, hear, and smell the large Murphy-Brown hog trucks which pass behind, beside, and in front of their home on a frequent basis, leaving a trail of odor and, at times, effluent on the road. Dead or alive the swine being hauled into and out of the property leave odor on his property and at times leak waste onto the road in front of his home.

42.     Jerry Boney's home is very close to the driveway to the Crooked Run facility as well as the facility itself.

43.     Mr. Boney has lived with this large hog facility in his backyard for many years. Furthermore, photos show how the facility has been spraying the waste into the air on the fields during that time, including in the summer when the weather can be very warm.

44.     Further, the lagoon or cesspool between the hog sheds has been full of waste liquid throughout, coming from the thousands of hogs art the site.  At times, a visible build-up can be seen on the cesspool surface.

45.     The hogs were brought into the community years after many of the Plaintiffs first lived there.  A historical photo from 1988 reflects how the Crooked Run facility did not yet exist.

46.     However, since that time both the Crooked Run facility to the south of Mr. Boney, and the Willow Creek facility to the east, have been constructed.

47.     Prior to the Facilities' construction, Mr. Boney had no concerns about any odor or fly presence because there was no presence like there is on a recurring basis now.  These nuisances have significantly impacted his and his family's ability to enjoy their property.

48.     During the pertinent times and over the last several years, Jerry Boney has suffered frequent episodes of noxious and sickening odor caused by the hogs.  He has inhaled periodic foul odors that came onto his property from the Defendant's hogs and their waste.  He has frequently smelled strong, foul odors from the hogs.

49.     Over the last several years, Jerry Boney has been harmed by the episodes of foul stench. The odor itself has been ugly, unpleasant, nauseating and unenjoyable to smell.  He has had to smell it while engaging in normal activities on his own property.

50.     When the smell has been bad, Jerry Boney has had to keep windows and doors closed and limit time outdoors.  The foul odor has limited his ability to enjoy time with family and friends in activities like sitting outdoors, having cookouts or keeping the windows open.  He

and his family used to grill out and eat outside on a regular basis. However, ever since the Defendant's hogs have been kept on property adjacent to his, the odors have kept them from eating outside. If he and his family decide to grill out, they generally take the food inside because of the odors, and are no longer able to enjoy their yard as they once could.

51.     In addition to the injuries alleged above, the presence of the thousands of hogs has also decreased the value of the land on which Jerry Boney resides.

52.     Mr. Boney has been employed for years with the Duplin County school system. He has not been able to properly enjoy his time off of work due to the hogs.

53.     The best way he can describe the smell is that it is a smell of manure, and a harsh smell like burnt popcorn. It is simply bad odors, but worse than what is expected in the country.

54.     His home is very close to the entrance drive to Crooked Run. As can be seen from the photos, it is a dirt drive. Thus when the trucks go in and out every week, they cause not only additional smell but dust and noise. Mr. Boney has seen liquid running out of the back of the trucks.

55.     Mr. Boney used to regularly raise his windows at night or during nice days to let fresh air into his home. Now, with the hogs so close, he never leaves his windows raised at night because of the likelihood that the odors will get into his home. As a result, his electricity bill is significantly higher now that he must run his air conditioning for much longer periods than if he could open his windows for sustained periods.

56.     Almost every morning before sunrise, Mr. Boney can see and/or hear a large truck enter and exit from the Facility which, upon information and belief, is a "dead truck" hauling away Defendant's hogs that have died. This truck causes a great deal of racket when it enters and exits the Facility, the driveway of which is very close to Mr. Boney's home.

57. Mr. Boney has found that when the flies get really bad, he cannot function outside. For instance the flies get all over your clothes and skin and food when you try to cook outside. The flies get on the windows and get into the house.

58. Mr. Boney has seen the spraying occur. The fields where the spraying can happen are right in back of his house. There is no significant barrier of forest trees to protect him from the fumes, spray mist and smell.

59. Mr. Boney has seen the hog farm runoff in the ditches around his house as well.

60. Mr. Boney has had to stay indoors when he would have liked to sit outside, because of the nauseating smells and the flies. He has had to run his air conditioner when he could not open the windows. He has had to buy air freshener products.

61. Mr. Boney and his neighbors have complained before about the hogs. However, before this lawsuit was filed, no changes were made.

**iv. <u>Annie Hayes</u>.**

62. Plaintiff Ms. Hayes has lived at her current home at 325 Red Tip Lane since about 1972 when she and her husband, Leslie Hayes, began living there. They raised their four children on this property. He passed away in 1989, but she has continued to live there.

63. Like the other Plaintiffs, her home is very close to the Facilities where Defendant's swine are kept.

64. The odor emanating from the swine frequently make her nauseous when she is outside. Since the Facilities' construction, she has spent considerably more time inside her home to avoid the periodic but frequent odor and increase in flies around her property. She is always mindful to close her front door immediately so as to not let any flies or odor into her home. She keeps the odor out by keeping her windows closed and uses air freshener inside.

65.    In addition to the injuries alleged above, the presence of the thousands of hogs has also decreased the value of the land on which Plaintiff resides.

**v. Mae Mazyck.**

66.    Plaintiff Ms. Mazyck was born in 1922.  She is now over 90 years old.  She lives across the road from and about halfway in between the two Facilities, within close proximity of each.  She and her husband, Caesar Mazyck, bought the property in about 1974 and although her husband died in 1984, she has lived here ever since.

67.    During the pertinent times and over the last several years, Ms. Mazyck has suffered frequent episodes of noxious and sickening odor caused by the hogs.  She has inhaled periodic foul odors that came onto her property from the Defendant's hogs and their waste.  She has frequently smelled strong, foul odors from the hogs.

68.    Over the last several years, Ms. Mazyck has been harmed by the episodes of foul stench. The odor itself has been ugly, unpleasant, nauseating and unenjoyable to smell.  She has had to smell it while engaging in normal activities on her own property.

69.    When the smell has been bad, Ms. Mazyck has had to keep windows and doors closed and limit time outdoors. The foul odor has limited her ability to enjoy time with family and friends in activities like sitting outdoors, having cookouts or keeping the windows open.

70.    The quality of her life on the property has been diminished by the recurrent odors emanating from the swine being housed at the Facilities.  The odors for her come at various times of a day, but are particularly obnoxious around the time it is or has been raining.

71.    As she lives between the two facilities, large Murphy-Brown hog trucks pass by her home quite frequently, which did not occur when she and her husband first began living here.

13

72.     In addition to the injuries alleged above, the presence of the thousands of hogs has also decreased the value of the land on which Plaintiff resides.

73.     Ms. Mazyck describes that for her the smells have been the worst on windy days and after it rains.  The odors can be particularly obnoxious around the time it is or has been raining or of an early morning.  She has also had problems with many flies along with the smell.

74.     Ms. Mazyck is retired.  She spends a great deal of time at her home.  The odor and nuisance has injured her ability to enjoy her retirement.

75.     Ms. Mazyck used to enjoy sitting and drinking coffee on her front porch of a morning, before the Facilities were constructed and began housing Defendant's hogs.  Ever since, she has largely stopped this due to the odors.  At times, she feels like she is held captive in her home by the odors.  Now that she is retired and 92 years old, she is not able to travel around like she used to and therefore spends the vast majority of her time at home.  She would like to be able to use and enjoy her yard as she once was able.  Instead, the odors keep her inside with the windows and doors shut, generally.

76.     As overhead photographs show, Ms. Mazyck lives less than half a mile north of the Crooked Run site, and about half a mile west of the Willow Creek site.  Further, close-up photos of the site cesspools reflect a build-up of filth periodically in those lagoons.

77.     Before the Defendant began hauling its hogs to be kept next door, she enjoyed keeping her windows open for long periods of time, such as throughout the night as she slept, to allow some cross-ventilation of her home and to cut down on her electric bill.  She no longer does this due to the potential of strong hog odor coming into her home.

78.     Ms. Mazyck loved to tend and enjoy her yard prior to the hogs.  She kept roses, which required a great deal of maintenance, as well as other herb and flower gardens.  Once the

14

hogs and their waste started being kept across the street, she no longer enjoyed it and eventually stopped because of the odors she would smell at times while tending to her yard and spending time outside in her yard.

79. As a further example, Ms. Mazyck used to hang her clothes to dry on a clothesline in her yard. Once she started smelling the odors in her clothes, however, she stopped hanging clothes outside and had to dry them in her indoor electric dryer. Just as the increased use of the air conditioning due to the Defendant's hogs has increased her electric bill, so has the lost use of her clothesline.

### vi. **The Woodards.**

80. Nicholas Woodard, Sr., and his wife, Evelyn Woodard, have lived at their property on Highway 11 since approximately 1987, the year they married and bought the property from Mr. Woodard's grandfather. On this property, they raised all their children: Nicholas Woodard, Jr., Dominique Woodard, and Shatinah Woodard, each of whom are at least 18 years of age and still live on this property. They are all plaintiffs in this action as they have each been significantly impacted by the recurrent nuisance created by the Defendant's swine.

81. Nicholas, Jr., and Dominique are both in the United States Marine Corps Reserves and Shatinah just graduated from high school. Each of them were born and raised by their parents on this family property.

82. Much like the other plaintiffs in this action, the Woodards experience recurrent odor emanating from the Defendant's swine at the two Facilities. They live next door to fellow plaintiff Mae Mazyck and are also approximately one-half mile from either Facility.

83.     Living so close to and between the two Facilities as they do, they very frequently see and hear large hog trucks pass by their home going to or leaving either of the Facilities, sometimes leaking effluent from the trucks onto the road and leaving an odor on their property.

84.     As an example of how the nuisance has impacted their lives is that one Saturday in June 2013, the Woodards were throwing a "thank you" cookout for friends of theirs.  These friends whom they were thanking had thrown a "breast cancer benefit" dinner for Evelyn Woodard earlier that year because she had just gone through significant breast cancer treatments. At the June 2013 thank-you cookout at the Woodards' home, the odor and flies were so bad that day that they had to bring all the food and tables inside.  Unfortunately, their home is not large enough to accommodate the number of people who attended.  Most of those individuals had to either eat quickly inside and leave the property, or take their plates with them and leave. Although each of the Woodards is accustomed to this significant nuisance, they were all embarrassed and annoyed that their guests had to endure it on what was supposed to be a special day.  This type of odor and fly nuisance happens with regularity for the Woodards, but this event stuck out to them because of the occasion – thanking friends and family for supporting Evelyn and her family during a very difficult time as she battled cancer.

85.     As a further example of the impact the Defendant's hogs has had on this family, Shatinah, who is 18 and just recently graduated high school, used to regularly ride the bus to school before she graduated.  She had to wait for the bus at the end of their driveway and the odor frequently was very noticeable, bothersome, and upsetting those mornings.  Evelyn also remembers well those frequent occurrences of odor that she and her daughter would have to endure while she waited on the school bus.

16

86. During the pertinent times and over the last several years, Nicholas Woodard, Sr., Evelyn Woodard, Nicholas Woodard, Jr., Dominique Woodard, and Shatinah Woodard have each suffered frequent episodes of noxious and sickening odor caused by the hogs. Each has inhaled periodic foul odors that came onto their family property from the Defendant's hogs and their waste. Each has frequently smelled strong, foul odors from the hogs.

87. Over the last several years, each of the Woodards has been harmed by the episodes of foul stench. The odor itself has been ugly, unpleasant, nauseating and unenjoyable to smell. Each has had to smell it while engaging in normal activities on their family property.

88. When the smell has been bad, the Woodard family members have had to keep windows and doors closed and limit time outdoors. The foul odor has limited their ability to enjoy time with family and friends in activities like sitting outdoors, having cookouts or keeping the windows open.

89. In addition to the injuries alleged above, the presence of the thousands of hogs has also decreased the value of the land on which Plaintiffs reside.

**vii. Harvey Tate, Jr.**

90. Plaintiff Harvey Tate, Jr., lives at his family homeplace at 5500 Highway 11 which has been his primary residence practically his entire life. His great-uncle, James Tate, built the home in or about 1971, but died shortly thereafter, and Harvey Tate's late parents began living there. His father and mother died in 2001 and 2011, respectively, but he has continued to live in his family home.

91. Although very close to both facilities, the Crooked Run facility is visible from his backyard.

92.     Since his parents have passed away, he has considered doing renovations and improvements, but has not because the Defendant has destroyed his quality of life on his family homeplace.  He also believes that his property value is significantly lower, in real terms, because of the nearby presence of Defendant's swine.  Moreover, he is embarrassed when guests come to his home because of the foul odor that frequently drifts from Defendant's swine.  Prior to the Facility being constructed, he and his family would often have outdoor events and cookouts on their property, but no longer do this in large measure due to the Defendant's swine.

93.     In addition to the odor, Mr. Tate sees large hog trucks passing by quite frequently, sometimes leaking what appears to be hog effluent onto the road.  This and the presence of the swine so close has affected the quality of his well water, he believes, as the quality was of no concern prior to the Facilities.  For this reason, he purchases bottled water to drink instead.

**B.  Background on the Facilities.**

**i.  Background on the Crooked Run Facility.**

94.     The **Crooked Run Farm** Facility is a CAFO with permit number AWS710012 issued by the North Carolina Department of Environment and Natural Resources ("DENR").  It is located on Highway 11 in Pender County.  Its approximate GPS coordinates are latitude number  34.6669, longitude number -78.0164.

95.     Upon in formation and belief, the Crooked Run Facility is owned by Bandit 3 LLC ("Bandit 3"), a limited liability corporation of Sampson County created in 2011 and owned by Robert Montgomery, Joseph Butler, and Ryan Butler.  It is a "feeder to finish" facility with an allowable count of 4,200 hogs.  The Facility has approximately seven hog buildings to house Defendant's swine and a large open-air cesspool also known as "lagoon."  Bandit 3, however, never owns the hogs it houses.  Upon information and belief, all the hogs are at all times during

18

the life of the hog directly owned by Murphy-Brown. Upon information and belief, Robert

Montgomery is currently an employee involved in "ingredient procurement" for Murphy-Brown.

96.     Upon information and belief, the facility now known as Crooked Run opened in

1990 and, for all pertinent times, is and has been a "contract grower" for Murphy-Brown (or its

predecessors) meaning that Bandit 3 contracts with Murphy-Brown to raise its hogs until they are

ready to be sent to a processing facility.

97.     Upon information and belief, Crooked Run has had a number of regulatory

violations while attempting to manage the waste created by Defendant's swine, the most recent

of which are set out below.

98.     On February 25, 2014, DENR sent Bandit 3 a Notice of Violation ("NOV")

describing the violations it noted on its inspection. This letter noted: (1) failure to maintain

vegetative cover on the spray fields in accordance with the management plan, (2) failure to

maintain adequate "freeboard" of the cesspools, i.e., the distance between the surface of the pool

and the top of the earthen rim of it, and (3) failure to notify DENR of the inadequate freeboard as

required. This NOV was carbon-copied to Kraig Westerbeek of Murphy-Brown. Upon

information and belief, Mr. Westerbeek is director of environmental compliance for Murphy-

Brown.

99.     On March 27, 2014, DENR issued yet another NOV citing, this time, four

violations: (1) excessive land application resulting in ponding of effluent on the spray fields and

running into a ditch, (2) failure to maintain vegetative cover on the spray fields in accordance

with the management plan, (3) failure to have an operator in charge or person under his

supervision to inspect the land as often as necessary to prevent ponding of effluent on the spray

fields, and (4) failure to notify DENR within the required time of the deficiencies of the Facility. This NOV was also carbon-copied to Kraig Westerbeek of Murphy-Brown.

100.    On April 8, 2014, Robbie Montgomery of Bandit 3 and Murphy-Brown responded to the March 27, 2014 Notice of Violation.  This response, written on Murphy-Brown letterhead, describes the methods taken to correct "mismanagement" of this Facility which ultimately led to the noted violations, including the improper spraying onto the fields near the Plaintiffs which ran into an adjacent ditch.

**ii.  Background on the Willow Creek Facility.**

101.    The **Willow Creek Sow Farm** Facility is a hog CAFO with permit number AWS710008 issued by DENR.  It is located at 6486 Highway 11, Willard NC 28478 in Pender County.  Its approximate GPS coordinates are latitude number 34.672467, longitude number -78.004383.

102.    Upon in formation and belief, the Willow Creek Facility is owned by Godwin Twins, Inc. ("Godwin Twins"), a limited liability corporation of Sampson County created in 2000 and owned by Oliver Godwin and Diana Godwin, both of Duplin County.  Willow Creek is a sow farm, or a "farrow to wean" facility with an allowable count of 1,446 hogs.  The Facility has four hog buildings to house Defendant's swine and a large open-air cesspool.  Upon information and belief, all the hogs are at all times owned by Murphy-Brown.

103.    Upon information and belief, the Willow Creek facility opened in 1991 and, for all pertinent times, is and has been operated by a "contract grower" for Murphy-Brown or its predecessors meaning that Godwin Twins, the current "contract grower," contracts with Murphy-Brown to raise its hogs until they have reached the weaning stage of the growing process.  Like

20

the Crooked Run facility, Willow Creek has also had regulatory issues including ponding of hog waste on their spray fields.

**C.**    **Background on Hog Manure and Odors.**

104.    Hogs generate multiple times more feces and urine per day than a human being. In 2002, the General Accounting Office estimated that 7.5 million hogs in five eastern NC counties produced 15.5 million tons of manure each year.

105.    Furthermore, Murphy-Brown's diet and antibiotic regimen is meant to promote aggressive growth, causing more manure to be generated in less time.

106.    A hog may grow from birth to 250 pounds in about six months or less before it is slaughtered.   A piglet usually feeds from its mother until it is three to four weeks old and weighs about 10 to 15 pounds.  Then its diet is transitioned to feed grain over the next few weeks until it is about 9 weeks old and weighs 40 to 60 pounds.  Then it is known as a feeder pig.  It takes about six months altogether for a pig to reach market weight of over 250 pounds.  A slaughter-weight hog is thus about fifty percent heavier than an average person.

107.    The hog odors can be smelled at extremely low concentrations that cannot be measured with available instruments.

108.    Dietary manipulation can reduce odor.  Murphy-Brown supplies all the feed and sets the ingredients and additives for its hogs and on information and belief has tailored the diet without regard to reducing the odor and nuisance.

**D.**    **Other Causes of Nuisance From Flies, Buzzards, Trucks, Dead Boxes.**

109.    In addition to and separate from any foul odors, the presence of Defendant's hogs causes periodic swarms of flies and other insects and pests.  The Plaintiffs and their families find that large black flies periodically come onto Plaintiffs' properties.  These flies were not prevalent

before the thousands of hogs were placed at the CAFO.  The flies impair cookouts and other outdoor activities.  Other insects such as gnats also come onto Plaintiffs' property.  The flies get stuck to windows and get inside the homes.  They land on peoples' skin and on their food and are disgusting and humiliating.

110.    These insects and pests are also scientifically found to be "vectors" for disease. Flies for example can carry germs.

111.    In addition, ever since the hogs have come, very large trucks crawl up and down the streets outside of the Plaintiffs' homes.  The trucks cause noise, dust, and lights from headlights and they pass even in the middle of the night.  Further, when the trucks bring hogs in and out this can create extra odor.  And, when the "dead trucks" come for dead hogs, they can create extra foul odor as well as dripping foul substances.  These trucks are the opposite of what one would expect to see in such a rural country neighborhood.

112.    In addition, the dead hogs themselves are a nuisance. Animals in confinement under high-density circumstances present a ready climate for disease.  As a result, many swine facilities have used vaccines and antibiotics not only to promote growth but also to counteract the health effects of crowded conditions.  It has been estimated that as much as 80% of all antibiotics administered to CAFO animals are at sub-therapeutic levels, i.e., they are not used to treat animals that are sick.  Unfortunately the crowded often hot conditions still lead to significant mortality rates.  The pigs cannot develop resistances to disease like they would living in pastures outdoors, and their systems have extra stress from living in close quarters without any earth to root or dig in, resulting in weakened immune systems. The pigs are susceptible to infection, microbes, parasites and fungi.

113.    The mortality rates from the CAFOs as well as periodic epidemics of diseases such as PEDV (Porcine Epidemic Diarrhea Virus) result in there being many dead hogs from time to time placed in "dead boxes." These are nothing more than dumpsters full of dead animals left out in the open often in plain view so that neighbors see rotting animal corpses in the middle of their neighborhoods.  These "dead boxes" are unsightly and attract buzzards, flies and vermin, and are a further cause of nuisance.  Periodically a "dead truck" picks up the dead hogs to drive them to a rendering plant.  For no reason but convenience for the CAFO the dead boxes are often placed in plain view by the street.  This increases the nuisance to the neighbors.

### E.    Murphy-Brown's Control Over its Hogs.

114.    Defendant is a large and sophisticated company and precisely monitors the activities occurring at the facilities holding its hogs.  Defendant through standardized procedures and equipment monitors the number of hogs at each site, the amount of feed used, the growth rate, the amount of feces and urine going into the cesspools, and the "freeboard", i.e., the distance between the surface of the cesspool and the top of the earthen rim surrounding it.

115.    Defendant has publicized in the past how it exercises detailed control over the operations of the facilities that hold its hogs.  Defendant uses trucks to haul its hogs from one site to another depending on what is most efficient and profitable for Defendant.  Defendant has also used tanker trucks to haul manure and flush water from one lagoon to another at different sites for reasons including when the volume that is being generated threatens to flood a lagoon.

116.    Murphy-Brown was formed in 2000 from an acquisition by Smithfield of companies owned by Wendell Murphy, Sr. (the founder of the business), the Murphy family, and Murphy businesses including Murphy Family Farms (collectively "Murphy"), as well as Brown's of Carolina.  Mr. Murphy is credited with adopting the CAFO design of mechanized

farms that had first been invented for poultry raising in other states. However, hogs generate a great deal of manure, and North Carolina is more densely populated than many other agricultural states and the coastal plain land has a shallower water table and more wetlands. Murphy required growers to invest in CAFO equipment if they wanted to hold Murphy hogs and increased the number of hogs until counties like nearby Duplin and Sampson became the most densely-packed hog counties in the entire United States.

117. The close confinement of hogs also means epidemics can spread through hog populations and diseases such as Porcine Epidemic Diarrhea Virus aka PEDV have led to "PED" signs outside many of the facility gates and at roadsides at various times.

118. Recognizing the unsustainable and injurious nature of the "lagoon and sprayfield" system, North Carolina banned further construction of CAFOs that use the design in 1997. This ban was re-enacted in 2007. Under this "moratorium," in fact hog producers are free to build new facilities so long as among other things, they will not cause odor to cross onto neighboring land. Upon information and belief, no new CAFOs have been built using the lagoon and sprayfield design, in an admission of their nuisance-causing nature.

119. The 1997 moratorium was enacted only after CAFO construction began to threaten the Pinehurst golf course. The bill was sponsored by North Carolina State House Representative Richard Morgan who stated that he filed the bill because he was "worried about industrial-style hog farms cropping up near golf courses in Moore County" and stated that his aim was to "draw a distinction between farming and the mass production of swine."

120. Under the Murphy CAFO design, hogs step, sit and lie on the raw manure and it gets on their bodies closely packed in the sheds. The hogs squish and push it down through the slats in the floor. It drips into a holding pond below the floor where it sits like an unflushed

toilet.  Large fans at the ends of the sheds ventilate to keep the hogs from suffocating.  The hogs create dust that dries and turns into floating particles, and smells from the feces and urine goes into the air and is blown out by the fans.

121.   After manure collects under the slatted floors, it gets flushed or drained out through pipes into the nearby open-air, uncovered, artificial cesspool filled with millions of gallons of hog urine and feces and flush water.  Because the cesspool is uncovered, it is free to evaporate bad odors into the air.

122.   The manure is also spread on nearby fields.  Often this is done by a "traveling gun" system in which liquid is sprayed up into the air, and mist can drift off.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection or "knifing" the effluent into the ground can help lower odor.  Yet on information and belief, Defendant has not required this at most of its swine sites in North Carolina even though it has replaced spray irrigation at sites in one or more other States.

123.   On information and belief, at other sites, Defendant has taken steps to reduce the nuisance.  However, on information and belief Defendant has failed to institute some or all of these measures at the sites that are the subject of this Complaint.

124.   In 2000, due to widespread concerns about pig farm odor coming from lagoons, North Carolina commissioned a multi-year study known as the "Smithfield Agreement."

125.   After years of study under the Smithfield Agreement, a majority of the economic committee members found there was economic feasibility for improvements.  A minority opposed the finding.  The minority report was signed off on by:  Bart Ellis (of Smithfield Foods, Inc.), Dave Townsend and Dennis Dipietre (both of Premium Standard Farms, acquired by Smithfield in 2007), Bundy Lane (a Murphy-Brown contract grower who co-founded Frontline

Farmers, a pork industry interest group), Richard Eason (President of Cape Fear Farm Credit that finances CAFOs for Murphy-Brown growers).

      **F.**     **<u>2013 Acquisition of Murphy-Brown and Smithfield by Shuanghui</u>.**

126.    Defendant Murphy-Brown, LLC is a limited liability company organized under the law of Delaware. Its principal office as of March 25, 2014 was 200 Commerce Street, Smithfield, VA 23430. Its sole member is John Morrell & Company.

127.    Morrell is a corporation incorporated under the law of Delaware with its principal office at 200 Commerce Street, Smithfield, VA 23430. Morrell is a wholly-owned subsidiary of Smithfield Foods, Inc.

128.    Smithfield is a corporation incorporated under the law of Virginia. Smithfield has a principal office located at the same address as Morrell and Murphy-Brown, at 200 Commerce Street, Smithfield, VA 23430.

129.    Prior to 2013, Smithfield was publically-traded company listed on the New York Stock Exchange. As of November 29, 2012, 138,696,747 shares of Smithfield's Common Stock were outstanding. However in 2013, Smithfield and its subsidiaries including Murphy-Brown were acquired by Shuanghui International Holdings Limited, which later changed its name to WH Group Limited. Per the Smithfield website, "[o]n September 26, 2013, Smithfield Foods announced the completion of a definitive merger agreement with Shuanghui International Holdings Limited, which is now named WH Group Limited."

130.    The transaction was estimated to have a value in excess of $7 billion.

131.    Shuanghui/WH Group is the largest pork producer in the world. Per the WH Group website, "WH Group is the largest pork company in the world, with number one positions in China, the U.S. and key markets in Europe."

132. WH Group is the majority shareholder of Henan Shuanghui Investment & Development Co., China's largest meat processing enterprise. The WH Group website describes how "[w]e are a majority shareholder in Henan Shuanghui Investment & Development Co., Ltd. … (www.shuanghui.net), China's largest meat processing business, and own Smithfield Foods, Inc. (www.smithfieldfoods.com), a global food company."

133. WH Group, formerly known as Shuanghui International Holdings, controls Smithfield and Shuanghui Development.

134. Under the terms of the merger agreement, Shuanghui/WH Group acquired all of the outstanding shares of Smithfield Foods for US $34.00 per share in cash. The purchase price represented a premium of approximately 31% over Smithfield's closing stock price on May 28, 2013, the last trading day prior to the acquisition announcement.

135. After the acquisition by Shuanghui/WH Group, Smithfield's common stock on the New York Stock Exchange ceased to be publicly traded. Smithfield became a wholly owned subsidiary of Shuanghui/WH Group.

136. The President of Shuanghui is Wan Long. He is also the Executive Director, Chairman and Chief Executive Officer of WH Group. He has been the Chairman of the Board at Smithfield Foods, Inc. since September 26, 2013. Wan Long is referenced in Smithfield press releases found on the Smithfield website.

**G. Defendant's Business Plan to Increase Exports to China.**

137. When the 2013 acquisition was announced, Shuanghui announced per a Wall Street Journal article that it "intends to quickly ramp up pork exports from the U.S. as its top priority after Thursday's closing of its $4.7 billion acquisition of Smithfield Foods Inc…." Wan Long, the new chairman of Shuanghui, said in a joint interview with Larry Pope that "[f]or this

acquisition, we have one guiding principle: to accelerate Smithfield's global expansion ….We will provide better organization and distribution of Smithfield's products to all parts of the world."   Smithfield CEO Larry Pope said that the acquisition will expand sales of pork products to China.

138.    As of 2013, according to Smithfield, China already accounted for about a quarter of Smithfield's pork exports in terms of volume, and shipments to the country rose 15% in the fiscal year that began in April 2013 compared with a year before.

139.    In 2013, Murphy-Brown's spokesman Don Butler publically stated that the acquisition of Smithfield by Shuanghui "will result in increased exports to China."

140.    Murphy-Brown has touted its business plan to increase exports in newsletters that it sent to growers and the general public.  According to its Winter 2014 newsletter, page 3, which is available on the Murphy-Brown website:

> "WH Group's acquisition of Smithfield, which was completed in September 2013, is the largest acquisition of a U.S. company by a Chinese company to date. The transaction merged the best technology, resources, practices, market access and operational expertise of the two companies to create a leading global pork company across the industry value chain, with an unmatched set of assets, branded products and geographic reach.  Among its growth initiatives, WH Group is focused on increasing exports from the United States to Asia, building a global trading platform and exploring opportunities to work with Smithfield to develop premium products for the Chinese market."

141.    Larry Pope, in his capacity as President & Chief Executive Officer, Smithfield Foods, provided written testimony to the Committee on Agriculture, Nutrition and Forestry, of the United States Senate, dated July 10, 2013, in which he testified that that the company intended to produce more hogs in order to increase exports to China:

> "The new combined company expects to meet the growing demand for pork in China by exporting high-quality pork products from the US.  This means more production for US producers…. China is responsible for 50 percent of the world's pork consumption and their demand is still growing…. At Smithfield, we see this

valuable market as an undeniable opportunity to grow our business and produce more here in the US …. This transaction is about exporting high-quality meat products from the US to China."

142.     In 2014, Mr. Pope described to PBS and the Center for Investigative Reporting that the Chinese market for pork is growing exponentially: "Half of all the world's pork is eaten in that one country [i.e., China] and growing, and growing steadily. Every two or three years, China's consumption demand grows by the whole size of the U.S. market."

143.     WH Group stated in late 2014 that its business plan "means more production for U.S. producers … and more exports…."

144.     Presently, Murphy-Brown is following the instructions of its owners to increase pork production, and Murphy-Brown and Smithfield tout this business plans to its growers, to the U.S. government and to the general public.  The result of this new business plan means an increase in the nuisance to the Plaintiffs, and also means that it is feasible for Defendant to compensate for and to abate the nuisance.

**H.     Defendant's Increase of Pork Production to Serve the Rapidly Growing Chinese Market Is Increasing the Nuisance to North Carolina Residents.**

145.     Murphy-Brown's plan to increase production in accordance with the plan as described by Larry Pope and to supply the rapidly growing Chinese market will increase the nuisance to the North Carolina homeowners who reside near the hogs.

146.     North Carolina is the second-largest hog raising State in the nation.

147.     North Carolina raises more hogs for Murphy-Brown than any other State or more than almost any other State.

148.     As Murphy-Brown increases production in order to increase exports, this will cause more hog production in the State.

149.     More hog production at the hog confinement sites will lead to greater emission of waste, urine and feces, greater emission of foul and noxious odors, greater emission of ammonia, hydrogen sulfide and other harmful gases and substances, and will otherwise increase the nuisance and injury to the individuals who live close to the hog sites.

150.     One means to reduce the nuisance at a hog confinement facility is to lower the number of hogs in the herd at the site.  The business plan to increase production will have the opposite effect.

151.     Another means to reduce the nuisance at a facility is to slow down the production process and allow more time for clean-outs and waste disposal in between herds.  However, as a result of the Chinese merger and due to the export plan, Defendant's directive is the opposite:  to ramp up production and fill farms to capacity.

I.     **Under the Cost-Benefit Analysis of the Social Utility of the Business Causing the Nuisance, Versus the Harm it Causes to its Neighbors, the Nuisance is Unreasonable and Should be Abated and Victims Should be Compensated.**

152.     The nature, utility, social value and purpose of Murphy-Brown's operation increasingly revolves round producing pork to supply a rapidly growing Chinese export market. This social utility benefits the Chinese consuming public, Shuanghui, and Defendant.  However, it does not benefit and rather harms local North Carolina residents who live in the vicinity of the hog confinement facilities.

153.     Increasingly the utility and social value of Defendant's operation is to feed the rapidly growing pork export market to China, where its ultimate owner is located.  This social utility is increasing, while the utility of supplying the U.S. pork consumer market is declining, because United States consumer demand for pork is declining.

154.     The social utility of the increased production is to supply the Chinese export market with inexpensive pork.  This utility does not outweigh the harm that the hog production causes to North Carolina neighbors of the farms.

155.     In recent years, American demand for pork has decreased, after reaching a peak in 1999.

156.     However, pork consumption in China is quickly growing as the Chinese middle class grows and has the means to purchase meat instead of merely lower-cost vegetable foods.

157.     Pork consumption has increased nearly seven times in China since the late 1970s. Today Chinese people eat nearly half the world's pigs.

158.      The Chinese currently eat 88 pounds per capita each year, compared to 60 pounds per year for Americans.

159.     United States pork exports to China surged from about 57,000 metric tons in 2003 to more than 430,000 metric tons in 2012.

160.     Through August 2014, Chinese customs data showed a recent increase of 34 percent in pork imports from the U.S.

161.     As of 2014, the USDA expected U.S. pork exports to rise by another 0.9 metric tons by 2022, reflecting an increase of 33 percent from 2012 levels.

162.     The increase in exporting has accompanied the rise in the CAFO integrator model of hog production.  The United States became a net exporter of pork in 1995. Since 2000, net exports have increased nearly eleven-fold.

163.     An increasing number of the hogs that are being placed by Murphy-Brown at sites in North Carolina and that are causing harm to the neighbors are turning into pork sent to China.

164.    Another reason why North Carolina is increasingly becoming a factory farm for China is the fact that hogs cost less to grow in the U.S. than in China.

165.    In 2009, US hog producers had significantly lower costs per pound of live hog weight ($0.57) than commercial-scale hog producers in China ($0.68).

166.    As of 2011, the Beijing price of hams was more than double the US price, the price of spare ribs was nearly 50 per cent higher, and the price of bellies was nearly 40 per cent higher.

167.    A WH Group prospectus dated April 15, 2014, at page 188 described that "hog prices in the U.S. from 2010 to 2012 were approximately 40% lower than those in China…."

168.    It costs less to grow a hog in North Carolina than in China in part because Murphy-Brown invests as little money as possible in making sure the hog waste is controlled and the neighbors are not polluted and burdened with odor, flies and other causes of nuisance.

169.    Hogs cost less to grow in North Carolina than in China in part because Murphy-Brown locates hog farms close by each other and near feed depots and large Smithfield slaughterhouses.  This reduces gas and other costs to feed and move the hogs, but also increases the nuisance by increasing the hog density in communities.

170.    Hogs cost less to grow in North Carolina than in China in part because Murphy-Brown does not pay its local growers enough money to take care of the waste themselves.

171.    In recent months, Murphy-Brown and its parent companies have reported record profits since being acquired by the Chinese company.  However, the growers have largely not shared in that wealth and are still not paid enough to fix the nuisance on their own.

172.    Murphy-Brown's plan to increase exports to China is described in the 2014 WH Group prospectus which discusses how the Chinese market is giant and growing:  "China is the

largest pork consumption market in the world and is expected to grow further. China represented over half of total 2012 global pork consumption and Chinese pork sales account for over 60% of total meat consumption in China…. We believe pork consumption in China has significant growth potential because of macroeconomic factors that include rapid growth in GDP, increasing urbanization and rising per capita disposable income."

173.    The 2014 prospectus further describes how "[t]he U.S. is one of the largest hog producing and pork processing countries in the world, with one of the world's most efficient cost structures. For example, hog prices in the U.S. from 2010 to 2012 were approximately 40% lower than those in China…. We believe we can increase our exports to China because of the supply-demand gap in China and the scale of our U.S. operations."

174.    Before the merger with Shuanghui, Smithfield was already the largest pork exporter in the world, with a 36.7% share of the total U.S. pork export market.  And, China was already the world's largest pork importer, importing 0.6 million metric tons of pork in the nine months ended September 30, 2013, of which approximately 20.6% was from the U.S.

175.    The instruction that Murphy-Brown's parent companies have given it to increase exports to China is already causing a greater nuisance to the neighbors who live near the hogs.

176.    Specifically, on information and belief, since the merger, Murphy-Brown has instructed its growers to go to a "maximum flow" business model.  That is to say, it wants the farms to produce as many hogs as possible, as quickly as possible.  Further, it wants the growers to minimize the downtime between herds.

177.    The reason for this change in instructions to the growers is to increase the amount of pork available for export.  One effect is to increase the environmental strain on the hog confinement sites and the amount of waste and nuisance.

178. Defendant has made other changes specifically geared toward increasing exports to China. It has tailed off the use of ractopamine, a feed supplement and growth-promoting drug. It did so because China banned the supplement. As WH Group says in its 2014 prospectus, "we have transitioned a portion of our hog production and hog processing capacity to be ractopamine-free. We had daily ractopamine-free hog production capacity of 36,000 head and hog processing capacity of 43,100 head as of December 31, 2013, which we expect will be increased by 55.6% and 48.0% by July 2014, respectively."

179. Likewise, industry expert Daniel Slane has described in testimony to Congress:

"Smithfield has developed a special relationship with Shuanghui over several years. At its plant in North Carolina, the largest of its kind in the world, it is already producing ractopamine-free pork at Shuanghui's request. Other pork processing plants in the US could still find it hard to export to China, either because the cost of complying with ractopamine restrictions are too high, or because they do not enjoy the special privileges of a firm directly owned by a Chinese parent company."

180. As of February 2015, Murphy-Brown has already been growing pork for China for more than a year. According to WH Group, "[i]n January 2014, our U.S. operations made their first intra-group shipment to China of fresh pork, which was marketed through our distribution network in China."

181. WH Group in a recent interim report described how its production volume had increased by over 8 million heads and "[t]he significant increase in hog production volume was due primarily to our acquisition of Smithfield." These include the same hogs at issue in this case. The insistence on high volume means more crowded farms and more nuisance.

182. As of October 2014, WH Group was selling chilled pork meats at Smithfield-branded kiosks. These meat counters were located in mid-range to high-end supermarkets in

Henan Province, where WH Group is based. WH Group planned to open 80 kiosks and to debut in Beijing and other major Chinese cities by the end of the year.

183. As of October 2014, WH Group was also planning to build processing plants in Zhengzhou and Shanghai in early 2015 to process U.S.-imported pork into "high-end, Smithfield-branded, Western-style packaged meats."

**J.** **Because of the Acquisition of the Company by Shuanghui and the Quickly Increasing Export Market to China, the Financial Burden of Compensating the Victims of the Harm Would Not Make Continuation of the Enterprise Unfeasible.**

184. Here, the increased revenues and profits flowing from the increased exports to China support the conclusion that the financial burden of compensating the victims is feasible and the conduct is unreasonable. Further, it is not impractical for Defendant to prevent the nuisance, given the significant resources at Defendant's disposal.

185. Defendant has the resources to abate the nuisance and compensate victims. Recent financial disclosures highlight these resources. When WH Group acquired Smithfield including Murphy-Brown, it paid $4.7 billion. Since then, Smithfield has reported record revenues and quarterly profits.

186. On May 14, 2014, Smithfield issued a press release that "Smithfield Foods, Inc., a wholly owned independent subsidiary of WH Group Limited, today reported record 2014 first quarter results." Smithfield linked the growth in sales to exports, noting "a record first quarter with strong margin gains across all segments of our business. Our results reflect … an improved export environment owing, in good measure, to our strategic combination with WH Group. On that front, we are opportunistically pursuing exciting growth opportunities in the enormous and rapidly growing Chinese pork market that we expect will yield dividends for years to come."

187.  In part these increased profits and reduced costs were due to Defendant's business model of externalizing the costs of hog waste onto neighboring communities.

188.  An August 11, 2014 Smithfield financial report described how "opportunities with WH Group are advancing. For example, Smithfield branded premium chilled fresh pork sold at Smithfield kiosks in Mainland China has been well received by consumers with strong sales and customer traffic. We opened three new kiosks in July, bringing our total number of kiosks to 21, and plan to continue to expand throughout China to cover the major first-tier and second-tier cities by the end of the year. The early success of our Smithfield kiosks in China underscores the synergistic effect of our merger with WH Group."

189.  Smithfield on November 9, 2014 again announced record results, with "Hog Production operating profit +188%; record high." Smithfield touted how it had during the year to date grossed nearly $11 billion in sales, up from $10 billion the year before.  Overall net income for the period ending on September 28, 2014 totaled $155.3 million, a 340 percent increase over $35.4 million for the third quarter of 2013.  Smithfield reported operating profits that grew 43 percent in its packaged meats division.

190.  By refusing to invest revenues in abating the nuisance or compensating victims, Murphy-Brown has facilitated record profits for the enterprise.  The revenues have not gone to compensate victims or pay local growers, but rather to line the pockets of senior management. The 2014 WH Group prospectus described how Chairman and CEO Wan Long and director Yang Zhijun were awarded a combined $597 million bonus in company shares, as a "reward for contribution to the acquisition of Smithfield."  That was an incredibly large bonus, almost 13% of the deal's total value.

191.  Under the North Carolina standard for common law nuisance, all of these facts are appropriate to consider in determining whether the social utility of the enterprise outweighs the harm it causes, in determining whether Defendant can reasonably compensate victims, and in determining whether the Defendant has the ability to abate the nuisance.

### K. <u>Defendant's Ultimate Owner Touts How it Uses Control Technologies in China that Defendant Does Not Use in the U.S.</u>

192.  Defendant and its parent companies claim publically that they have taken adequate steps to address the nuisance.  These claims are inaccurate.

193.  For example, Defendant's ultimate owner WH Group claim on its website that the enterprise devotes extensive management resources to managing environmental issues:

> "Our environmental programs in our U.S. and international operations are led by senior managers and a team of senior environmental specialists who manage its environmental programs and drive performance improvements. Each of our independent operating companies in our U.S. and international operations also has a chief environmental professional, supported by at least one senior-level environmental management. Every facility maintains at least one environmental coordinator tasked with ensuring compliance at all times. Our independent operating companies in our U.S. and international operations communicate regularly with our corporate team and provide recommendations for process improvements. At the supervisory level, our managers receive regular environmental training. Across our U.S. and international operations, more than 65 individuals provide technical expertise and resources to support Smithfield's environmental management and sustainability goals."

194.  In addition, WH Group touted in 2014 how the organization's management engage in regular reviews of the environmental risks at the hog confinement sites:

> "The Group is subject to laws and regulations in the location in which it operates breeding of hogs.  The Group has established environmental policies and procedures aimed at compliance with local environmental and other laws. Management performs regular reviews to identify environmental risks and to ensure that the systems in place are adequate to manage these risks."

195.  In fact, however, Defendant has not invested adequate resources in correcting environmental issues as they affect immediate neighbors of the hog farms.

196.     WH Group touts that it has implemented measures to control odors and gases at farms in China, yet these measures are not used at the vast majority of the hog sites in North Carolina.  Specifically, on its website, WH Group states:

> "To control the environment impact of our hog production and hog processing operations in China, we have primarily adopted the following environmental protection measures:
>
> • Water. We have constructed waste water processing facilities to process the waste water from our hog production and hog processing operations. This helps us to ensure no waste water will be discharged in violation of the applicable PRC [People's Republic of China] laws.
>
> • Animal Waste. Manure and other animal waste from our hog production and hog processing operations are collected for efficient re-use as organic fertilizer. We have also established digester systems yielding biogas, which can be used for heating and/or electricity generation.
>
> • Greenhouse Gas. To reduce our greenhouse gas emissions, we endeavor to improve nutrient absorption of the hogs at our hog production facilities by adjusting the ingredients in our feedstuffs. Our animal waste management also helps to cut methane and nitrogen emissions. We have installed biological odor control systems at our hog processing facilities to reduce environmental odor pollution."

197.     At the vast majority of its sites that hold its hogs in North Carolina, Murphy-Brown has not "constructed waste water processing facilities to process the waste water" nor has it funded and supported the local growers to do the same.

198.     At the vast majority of its sites that hold its hogs in North Carolina, Murphy-Brown has not "established digester systems yielding biogas, which can be used for heating and/or electricity generation," nor has it funded and supported the local growers to do the same.

199.     At the vast majority of its sites that hold its hogs in North Carolina, Murphy-Brown has not "installed biological odor control systems at our hog processing facilities to reduce environmental odor pollution," nor has it funded and supported the local growers to do the same.

**L. Defendant's Involvement in a Large Vertically Integrated Enterprise Allows Defendant to Exercise More Control Over How its Hogs Are Raised and How Their Waste is Handled.**

200.    Murphy-Brown exercises great control over how the hogs it owns are raised due to what it calls the "vertically integrated" nature of the organization of which it is a part.

201.    In vertical integration, large corporations known as 'integrators" contract with individual farmers to raise animals and set precise standards for what the animals eat, their housing conditions, and the antibiotics and hormones they receive.  In public filings and on their websites, Murphy-Brown and its parents frequently make reference to the vertically integrated nature of their business.

202.    Murphy-Brown describes itself as a "vertically integrated" enterprise.  For example the Murphy-Brown website in a job notice for a position in Missouri stated:  "We are a vertically integrated operation that provides pork products for the retail, wholesale, food service and export markets.  Because of our vertical integration, we are able to ensure consistency, quality and value in pork products from conception to consumer.  We manage our own genetic improvement facility, sow farms and grow finish farms."

203.    Murphy-Brown is a vertically integrated operation because it is part of an overall enterprise that controls many separate parts of the pork production process.  Murphy-Brown is part of one integrated enterprise, in which WH Group owns the hogs through Murphy-Brown, owns the slaughterhouses and processing plants through the Smithfield Packing subsidiary, owns the genetic stock for the hogs through Smithfield Premium Genetics, owns the trucks that ship in hog feed and hogs, owns the feed mixture and depots, employs the engineers, technicians, inspectors and veterinarians who supervise and travel to the farms, and owns the consumer brands under which the pork products are sold.

204.     WH Group itself describes operations as a unitary enterprise when it includes

Murphy-Brown employees among "its employees," stating in a 2014 Interim Report:

> "A company is only as strong and successful as its employees, and WH Group is
> no different. Our roughly 120,000 employees, of which 73,213 in China as well as
> 47,000 in the U.S. and internationally as of 31 December 2013 are a fundamental
> reason for our success, and we work hard to create a fair, ethical, and rewarding
> work environment. We offer our farm and processing facility employees jobs with
> competitive wages and comprehensive benefits packages, and we encourage our
> employees to learn and grow within WH Group."

205.     WH Group includes the very hogs causing the nuisance in its reporting.  The 2014

Interim Report describes how "Smithfield processed 16,665 thousand [i.e., 16,665,000 – over 16

million] heads of hog."  The hogs included by WH Group in this number include some of the

very ones whose nuisance has injured the Plaintiffs.

206.     The full extent of the vertically integrated enterprise and its control over local hog

facilities is only made possible by how Murphy-Brown is part of the larger WH Group and

Smithfield enterprise.  Specifically:

- Murphy-Brown is the hog growing arm of the enterprise and is commonly
  described as the livestock production subsidiary of Smithfield Foods, Inc.

- Murphy-Brown hogs are bred from genetic stock designed and owned by
  Smithfield Premium Genetics.

- The hog feed is mixed and produced by Murphy-Brown.  With feed
  manufacturing capability in excess of 6.5 million tons per year and consumption
  of corn in excess of 150 million bushels, Murphy-Brown is one of the single
  largest consumers of U.S. feed grains in the world and uses use computerized feed
  mills to mix the feed formulas to its specifications and to manage product flow.

- Feed is trucked in to the hogs at the confinement sites by trucks and via a larger
  supply chain owned and controlled by Murphy-Brown.  The company uses state-
  of-the-art logistics programs to ensure it maximizes the efficiency of production
  operations, but the emphasis is on minimizing gas and transport costs, not on
  keeping large trucks away from vulnerable neighborhoods near the farms.
  Murphy-Brown owns or leases the trucks, employs the drivers, employs
  dispatchers, owns and operates truck wash facilities, and operates maintenance
  garages.  Murphy-Brown employs feed haul drivers and live haul drivers.

40

- Murphy-Brown picks up its grown hogs from the farms and trucks them to the slaughterhouses and processing plants owned by the same WH Group/Smithfield enterprise that owns it. The Smithfield Packing Company, Inc. has processing plants in multiple North Carolina locations including Clinton, Kinston, Tar Heel and Wilson.

- Murphy-Brown employs engineers, technicians, inspectors and veterinarians who supervise and travel to the farms.

- Murphy-Brown controls the antibiotics, medications, additives, supplements and drugs administered to the animals.

- Smithfield provides warehouse facilities and distribution facilities to transport pork products and keep the meat chilled.

- The WH Group/Smithfield enterprise owns the consumer brands under which the pork products are sold, such as Smithfield, Farmland, Gwaltney and Healthy Ones.

207.   The vertically integrated nature of Murphy-Brown's business results in Murphy-Brown extensively controlling, monitoring and managing the material details of the hog production enterprise.

208.   Smithfield's 2013 Integrated Report described how "Smithfield manages every aspect of the pork production process. Vertical integration is a key point of difference and a unique selling proposition for our products and brands, allowing us to drive changes through the supply chain."

209.   Murphy-Brown owns and operates research farms where it can develop and test potential improvements to the hog farming systems. For example, operations at one of its research farms in Rose Hill, NC include research studies, engaging in data collection and use of automated data collection systems, operating of nursery and finisher feed systems, monitoring both onsite and offsite, using specialized research equipment including ventilation/data controllers, light timers, and water treatment systems, and testing and experimenting with new

41

systems. The use of these research farms is another reason why Murphy-Brown is far better situated than the smaller contract growers to fix and correct the nuisance.

210. Murphy-Brown has numerous technicians tasked with waste management duties. These employees have extensive familiarity with the waste issues at the hog confinement sites. The contract growers often only have one or two employees and lack similar technical expertise.

211. Murphy-Brown employs engineers and other professionals who are very familiar with various technologies and control measures that can be implemented at confinement sites in order to reduce the nuisance. These employees have been assigned by Murphy-Brown to intervene when grower sites have run into environmental issues. These employees are familiar with control measures such as the use of a bioreactor, spraying of waste-degrading and odor-eating bacteria and use of a subsurface injection "Aerway" tractor at the Mitchell Norris farm site in North Carolina. They are familiar with the use of covers on the cesspools at some confinement sites in North Carolina and elsewhere. Thus in a press release, one of the vendors working with Defendant describes how "Murphy-Brown Missouri, formerly known as Premium Standard Farms, announced a $100 million partnership with Roeslein Alternative Energy to develop renewable biogas on nine finishing farms in Gentry, Mercer, Putnam, Sullivan and Worth counties. [Murphy-Brown executive] Mr. Homann expects lagoon covers to be installed on 88 Murphy-Brown lagoons in Missouri, with sites in Gentry and Worth counties covered by the end of the year…."

212. Murphy-Brown via its integrated multinational enterprise is aware of how control technologies can be used to reduce the noxious odors and harmful pollutants coming off the waste from its hogs. Murphy-Brown has admitted how these technologies reduce odors.

213.    For example, in 2014, Bill Homann, the director of administration and compliance at Murphy-Brown's Missouri affiliate, described how new technology would reduce odors: "Mr. Homann said the technology will allow Murphy-Brown to make significant reductions to odor coming from its lagoons. He also said the barn scrapers, which he likens to a 'big squeegee,' will represent an upgrade from the current technology that uses water to flush the waste into lagoons. That water, recycled from lagoons, can lead to odor problems."

214.    Murphy-Brown exercises extensive control over its North Carolina operations through its South Central Division based out of Rose Hill, its West Division based out of Laurinburg, its East Central Division based out of Kenansville, and its corporate offices based in Warsaw.

215.    Murphy-Brown on its website in describing these parts of its operations, touts how it "manages" both its own farms and those owned by contract growers. For example, Murphy-Brown describes its South Central Division as follows: "Murphy-Brown South Central, located in the counties of Duplin, Pender, Sampson, Columbus, Brunswick, and Cumberland has over 500 employees managing over 700 company and contract sow, nursery, and finishing farms. We have 220,000 sow, 760,000 nursery, and 1,800,000 finishing spaces."

216.    Murphy-Brown on its website describes its West Division as follows: "Murphy-Brown West Region, headquartered in Laurinburg, consists of two very important areas. Our Multiplication group is responsible for providing replacement breeding stock to commercial sow farms across Eastern North Carolina. Our Commercial group produces market animals for our Tarheel Plant located in Tarheel, North Carolina. Combined our region is home to 100,000 sows, 300,000 nursery spaces and 680,000 finishing spaces. Our production occurs at company-owned,

company-managed and contract-grower sites. We employ over 400 employees throughout Eastern North Carolina."

217.    Murphy-Brown describes its East Central Division as follows:  "Murphy-Brown East Central, located in the counties of Duplin, Onslow, Lenior, Jones, Johnston, Craven, and Wayne has over 300 employees managing over 500 company and contract sow, nursery, and finishing farms. We have 132,000 sow, 436,000 nursery, and 1,240,000 finishing spaces."

218.    Murphy-Brown describes that Smithfield Premium Genetics has locations in Roanoke Rapids, NC, Rose Hill, NC and Pampa, Texas.  According to the Murphy-Brown website, "Smithfield Premium Genetics is charged with improving the genetic traits of our animals throughout all of our Murphy-Brown operations. Research facilities in North Carolina and Texas employ over 200 people. Our largest farm located in Pampa, Texas, contains many state-of-the-art features. All of our facilities have a comprehensive bio-security program."

219.    The contract growers must follow the orders and rules from Murphy-Brown or risk losing the hogs, which they never own.

220.    The 2012 Smithfield annual report describes how "[a]ll company-owned and contract farms are subject to random third-party audits and site assessments" and how "Members of our production management staff … visit every contract and company-owned farm at least once a month."  Murphy-Brown constantly sends specialists to the sites such as engineers, technicians, inspectors, and veterinarians, and it controls relevant details of operation.

221.    According to Murphy-Brown and Smithfield on website materials, "[a]ll company-owned and contract farms are subject to random, third-party audits and site assessments…. Regular evaluation and training allow us to identify any areas of concern and make adjustments to procedures before problems occur.  Members of our production

management staff … visit every farm at least once a month.  All 2,040 contract farms … are reviewed for compliance."

222.     Murphy-Brown and its predecessor entities chose locations for confinement sites, facilitated the financing of the construction of sites, and specified design criteria of the sites.  In so doing, Murphy-Brown worked from a position of vastly more knowledge and information than any contract growers involved.

223.     Murphy-Brown continued to specify and facilitate the location and construction of sites even when there were already other hog confinement sites in the area growing Murphy-Brown hogs.  Murphy-Brown knew or should have known that placing more of its hogs in the area would increase the nuisance.

224.     Murphy-Brown caused Duplin and Sampson counties to become the most densely packed hog counties in the U.S.  The reason why Murphy-Brown encouraged such intense concentration of hogs was to minimize gasoline and other transportation costs for purposes of getting feed out to the hogs, sending technicians to the sites, and trucking hogs to the slaughterhouses located in Tar Heel and Clinton, NC.

225.     As of 1995, Murphy-Brown's predecessor entity, Murphy Family Farms, had built a massive feed mill in Duplin County.  The mill produced 15,000 tons of feed a week and had its own rail yard.

226.     As of 1995, it was reported that a typical contract grower borrowed anywhere from $200,000 to $1 million to construct hog sheds.  Murphy specified the CAFO design and equipment.  Murphy facilitated the financing for many growers.  While the grower carried the debt for a multi-year loan term, under the form contracts, Murphy could pull its hogs out at any time for a variety of reasons.  The CAFOs are "single use" facilities designed for raising hogs

and no other purpose. Wendell Murphy, Sr. described the situation with words to the effect of "once you pour the concrete, you are committed."

227. In addition, Murphy-Brown and its predecessors broke out hog growing into several stages each taking place at a different site. Thus, a pig may be born at one site, then trucked over to a second site for part of its growth, then trucked to a third site for the finishing stage before it gets trucked to the slaughterhouse.

228. The purpose of separating hog raising into separate stages at separate farms was to isolate the risk of epidemic disease at the sites. By keeping the hogs segregated for different stages of their growth, older hogs were prevented from passing along diseases to younger ones. This approach, while it increased profits for Murphy-Brown, also increased the nuisance for the neighbors because it meant there was a larger network of sites and constant trucking of the hogs from site to site.

229. Over the years Murphy has required some or all growers to accept terms under which if a grower fell into some lower percentage of all the growers on various metrics, such as the lowest 25%, Murphy could cancel the contract. These provisions incentivize the contract growers to work to maximize growth of the hogs at the expense of all other considerations. Meanwhile, at all times Murphy-Brown still owns the hogs. This system sometimes known as the "tournament" system pits contract growers against each other to cut costs and raise productivity above all other considerations. The system is unreasonable as there will always be a bottom fourth of growers even if they all perform well.

230. On information and belief, the metrics Defendant uses to rank the growers do not adequately weigh factors such as whether the odors, flies and fumes are harming neighbors.

Defendant during the pertinent times has known that its "tournament" system and other aspects of its management of the growers, the feed and the hogs cause the nuisance to increase.

231.    Murphy has admitted the control it has over the hog CAFOs and its direct involvement in the swine sites.  In 2011, Wendell Murphy, Sr. described that "[t]he typical livestock or poultry agreement is that the farmer or contract producer provide the facilities and labor, but in this case, to enhance the idea, to cause more people to come forward, we agreed to supply their materials...the fence and the posts, the feeders, everything."  However, in grower bankruptcy proceedings, Murphy-Brown contended it had no duty to keep pigs at the site if it wanted to remove them.

232.    The contracts between Murphy-Brown and its contract growers are contracts of adhesion which are one-sided and offered on a "take it or leave it" basis.  Because Murphy-Brown owns most of the hogs in the State, there are few other choices for a grower to do business with.

233.    Under its contracts, Murphy-Brown does not buy the hogs but rather actually own them from start to finish.  Murphy-Brown effectively employs the local farmers as their day laborers.

234.    The production contract used by Defendant pays the grower for the service of raising the livestock, not the livestock itself.  Defendant owns the product (the hogs) at all time. The growers are service workers.

235.    Defendant delivers the inputs (feed, pigs, transportation, etc.) to the grower and then picks up the hogs when the production is complete.

236.    The terms in the grower contracts do not reflect the reality of the integrator-grower relationship.

237.    The grower contracts recite that the grower is an independent contractor.  In fact, the factual reality reflects that the grower is a servant of the integrator, Murphy-Brown.  Because of this fact, the grower is entitled to receive all of the benefits and protections of the employer-employee relationship.  Further, because of this fact, Murphy-Brown is vicariously liable for any nuisance caused by the hogs it owns, by virtue of the conduct of its growers, who in the eyes of the law are servants and employees, acting in the normal course and scope of their employment.

238.    Under the grower contracts, the grower purportedly bears sole responsibility for what happens to the hog waste.  In reality, Murphy-Brown is jointly and severally liable for the waste nuisance, because it owns the hogs from which the waste comes and knows when it places its hogs at the grower sites that they will cause a nuisance to neighbors.

239.    Because of the vertically integrated nature of Murphy-Brown's enterprise, Murphy-Brown in conjunction with its parent companies earns multiple times more revenues from the hog production than do the local growers.

240.    Contract hog producers receive a tiny fraction of the value of their livestock from the integrator – between 10 to 12 percent of the production value in 2001.  In 2001, the integrator earned about ten times more than the growers.

241.    Murphy-Brown owns the hogs at as many as two-thirds of all North Carolina sites.  As of 2001, it was estimated that Murphy-Brown controlled approximately 70% of the hog production in the State.

242.    As of 2013, Murphy-Brown touted it had 5,000 employees, operations in 13 states, and over $3 billion in sales.  Smithfield/Murphy-Brown produced approximately 16 million hogs in the U.S. in 2013 and nearly twice the number of hogs produced by the next largest U.S. competitor.  Murphy-Brown dominates the North Carolina hog industry.

### M. The Social Utility of the Enterprise Is Not to Support "Local Family Farms."

243. Defendant contends that its enterprise has social utility and justifies any nuisance because it is simply "family farms" and "local farmers" as is evident in its marketing materials and advertisements. See the Murphy-Brown website, http://www.murphybrownllc.com.

244. These representations are inaccurate and do not properly portray the actual social utility of the enterprise and the harm it causes locally. In reality, the "family farms" are hog factories which scarcely resemble the traditional picture of a farm. The "local farmers" are service workers who do not own the hogs they grow.

245. Defendant uses the slogan, "Our Families Feed Your Families." In fact, more and more of the families being fed are in China. The harm is local; but increasingly the benefit goes out of the State and indeed out of the Country.

246. Defendant claims that its enterprise provides a multitude of benefits supporting North Carolina's economy and its citizens. In truth, North Carolina community members are being forced to endure nuisance odor, flies and harm in order to increasingly support not the local economy but a Chinese parent company and Chinese export market.

247. Murphy-Brown's corporate owners tout "sustainability" and "helping communities." In fact that when it comes to periodic emission of odorous and nauseating fumes onto Plaintiff's homesteads there is no "sustainable" practice and no "helping communities." Defendant's claim to be simply "family farms" helping the "local community" ignores the truth that it is part of a foreign multinational increasingly exporting to China.

248. Wan Long is the chairman of WH Group and of Smithfield and is quoted in Murphy-Brown materials. The Murphy-Brown Winter 2014 Newsletter quotes him:

> "The renaming of our corporate brand to WH Group reflects the increasingly global reach of our operations, which combine the largest pork production

49

companies in China and the United States and cater to consumers globally," said WH Group Chairman and Chief Executive Officer Wan Long. "It also symbolizes our ambition to be a world-leading company known for food products that meet best-in-class standards of quality, nutrition and safety."

249.    According to a 2013 article in the Wall Street Journal, Wan Long announced the expansion plan:

> "Known as 'China's No. 1 butcher' because his company slaughters more than 15 million pigs a year, Mr. Wan already has a considerable public profile in China as the top official in the country's largest meat producer by market capitalization...
>
> In March, according to a local media report, Mr. Wan declared…that he planned for Shuanghui to become a major multinational company, aiming specifically to become one of the top three meat firms in the world….
>
> Shuanghui is a closely held company controlled by a management group that includes Mr. Wan. "

### N.    **Evidence of Negligent, Willful and Wanton Conduct.**

250.    Murphy-Brown and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard to the harm known to be caused by the hogs. Over the years, Defendant has continued to cause its hogs to create nuisance and injury without taking action to end the nuisance despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

251.    Studies, reports, incidents and complaints that have amassed since Murphy first started the CAFO system clearly show predictable nuisance caused by swine sites to nearby neighbors.  However, Defendant has not stopped the nuisance, even after Plaintiffs have complained and even sent nuisance mediation demands over a year ago.

252.    From the early 1990s to present, due chiefly to Defendant and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members and Plaintiffs.  Production in North Carolina tripled between 1990 and 1995, growing from 5 million

hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendant's old system due to the indisputable evidence of harm and damage to neighbors.

253. Defendant and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water went into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

254. Mr. Murphy in a news article dated February 19, 1995 stated that there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the groundwater." In fact, hog CAFOs do harm the groundwater. Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

255. Mr. Murphy as reported on February 24, 1995 represented that CAFOs increased property values: "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave -- tell us about it. We'll buy it.'" Those statements were inaccurate. Numerous studies have shown that swine sites hurt property values. According to subsequent news reports, when one or more

CAFO neighbors later sought to take Mr. Murphy up on his offer and to have him buy their properties, Mr. Murphy backed out and refused to do so.

256.    In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act.  This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay.  The company's failures resulted in more than 5,000 violations of permit limits over five years.  These violations caused harm to the water quality of the Pagan River, the James River and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

257.    In April 1999, a spill at Vestal Farms, owned by Murphy, dumped over a million gallons of water in Duplin County.  Murphy and the NC Pork Council claimed the spill was caused by vandals.  The State found zero evidence to back up Murphy's claim.  In fact there was vegetation growing near the lagoon, tree roots weakened the wall and there were erosion issues. Murphy had been warned to clear the trees. The State concluded that excessive seepage through the dike wall was the probable cause. Nearly 2 million gallons spilled into a tributary of the Northeast Cape Fear River.  Murphy was fined $40,650.

258.    In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farms spilled and thousands of dead pigs floated in nearby areas.  This hurricane and other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in our State.  However in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

259.    In 2003, the non-partisan RTI institute issued a report regarding the nuisance and other bad impacts to North Carolina of the lagoon-and-sprayfield CAFOs.  The report found

among other things that the sites have a negative impact on "measures of human well-being" and found : "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms." It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation." Finally it noted "disease-transmitting vectors."

260.     Murphy has added special controls at sites in other States and has publically admitted that it was to "reduce the level of odor produced by the farms." Defendant has added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." Defendant is aware that the hog sites cause odor and nuisance, but willfully refuses to install improvements where its hogs are stored herein.

261.     In contrast to Defendant's assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that Defendant has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact. They also support the fact that the Plaintiffs suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing and loss of enjoyment and have reasonable fears regarding the effect of the nuisance upon them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

262.     Because Murphy recklessly failed to perform proper studies to determine the potential harmful effects of the swine CAFOs before have them built in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. As merely a few examples of the numerous studies that were produced from 1995 onward:

a.  A 1995 study reviewed the effect of odors from large-scale hog operations on neighbors. The results indicated that persons living near the swine experienced odors and reported significantly more tension, depression, anger, fatigue, and confusion. Persons exposed to the odors also had more total mood disturbance.

b.  Studies from 1996 and later reflect that swine CAFOs are disproportionately located in communities of color and poverty more susceptible to the nuisance and more likely to experience detrimental consequences.

c.  A 1997 study of neighbors living within a two-mile radius of a 4,000 sow swine facility found that they reported higher rates of negative effects.

d.  A 1999 report found that health effects of swine sites included "odors" and "flies" among others.

e.  A 2000 study found that hog sites are concentrated in southeast North Carolina in poor, rural and African-American communities who are more susceptible to harm and who report decreased quality of life.

f.  A 2000 study on odors from swine sites found that people living nearby reported more tension, depression, anger, fatigue, confusion, and less vigor.

g.  In 2000, the North Carolina Council of Churches noted that hog operations adversely affect "those who live in the surrounding neighborhoods."

h.  A 2002 paper described how CAFOs and their odor disrupt the quality of life for neighbors in rural communities.

i.  A 2005 study reviewed the health effects of residents near industrial hog farms in the Duplin/Sampson County area and found increased psychological distress.

j.  2006 studies surveyed children from schools in North Carolina who were near CAFOs and suggested that swine odor adversely affects the children.

k.  A 2006 study examined the air plume upwind and downwind from a CAFO and recommended buffering swine CAFOs from residential areas.

l.  A 2007 report found that "The encroachment of a large-scale livestock facility near homes is significantly disruptive of rural living."

m.  A 2007 study found that due to factors like low income, inadequate housing, low health status, and insufficient access to medical care, racial discrepancies compound the negative impacts that hog farms create.

n.  A study from 2007 noted how "Odour gives a problem when pig farms are located close to residential areas."

54

o. A 2008 study investigated residents living within 1.5 miles of industrial swine operations in eastern North Carolina. The study indicated that odor is commonly present and that the odors are related to interruption of activities of daily life.

p. A 2008 report found that "Recurrent strong odors" and "increased populations of flies are among the problems caused by CAFOs that make it intolerable for neighbors and their guests to participate in normal outdoor recreational activities or normal social activities in and around their homes."

q. A 2008 study noted that for residents near CAFOs "hog odor limits several leisure time activities and social interactions." The study focused on nuisance in North Carolina, defined to include conduct that "is injurious to health, indecent, offensive to the senses, or an obstruction to the free use of property." The study found that within 1.5 miles of CAFOs, "hog odor limits activities of daily living that participants either 'enjoyed' doing the most or expected to be able to perform inside and outside their homes. It restricts, for instance, activities like cookouts, barbequing, family reunions, socializing with neighbors, gardening, working outside, playing, drying laundry outside, opening doors and windows for fresh air and to conserve energy, use of well water, and growing vegetables."

r. A 2009 study found that individuals living in African-American communities in southeastern North Carolina near hog farms reported high rates of stress and negative mood.

s. A 2010 report noted how "CAFO odors can cause severe lifestyle changes for individuals in the surrounding communities and can alter many daily activities. When odors are severe, people may choose to keep their windows closed, even in high temperatures when there is no air conditioning. People also may choose to not let their children play outside and may even keep them home from school…. Odor can cause negative mood states, such as tension, depression, or anger…."

t. In 2011, a study summarized how "Animal manure and sewage sludge" were harmful to neighbors based on studies of 16 eastern North Carolina communities near industrial swine farms.

u. A 2013 study found that "malodors may be associated with acute blood pressure increases that could contribute to development of chronic hypertension."

v. A 2013 article noted that "Swine finishing operations near residential areas can create public nuisance concerns due to the annoyance potential of odor emitted from the houses."

w. A 2014 study of "odor concentrations … in the ventilation air from the pig rooms" found the results "indicate an acute need for … odor mitigation technologies."

## COUNT I: RECURRING, TEMPORARY, ABATABLE, PRIVATE NUISANCE

263.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

264.   Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

265.   Defendant, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties so as to cause a private nuisance.

266.   Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors; hog manure and urine; flies or other insects; buzzards or other scavenger animals; vectors of disease; trucks cause noise and lights at night and foul smells; dead hogs; and other sources of nuisance.

267.   The nuisance caused by Defendant's swine has substantially impaired Plaintiffs' and use and enjoyment of their property, and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, injury to and diminished value of properties, physical and mental discomfort and reasonable fear of disease and adverse health effects.

268.   Defendant has engaged in improper or negligent operation of swine sites during some or all of the pertinent times, causing harm to the Plaintiffs.

269.   Defendant's conduct has been unreasonable.  Reasonable persons, generally, looking at Defendant's conduct, the problems caused by it, the character of the neighborhood,

the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendant's conduct to be unreasonable.

270. The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

271. Defendant had actual knowledge during some or all of the pertinent times that the subject hogs were causing a nuisance.

272. Defendant knew or should have known that foul and offensive odors, hog manure and urine, flies and other insects, and other causes of nuisance from their hogs would recurrently encroach upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties.

273. While knowing that practicable technologies and methods are readily available to abate the nuisances and problems, Defendant has failed to abate the foul and offensive odors and other causes of nuisance.

274. During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and the facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which caused a nuisance to the Plaintiffs.

275. Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of the facility management of the hogs renders Defendant independently liable for the nuisance with regard to the Plaintiffs.

276.    Alternatively, during the pertinent times, Defendant employed contract growers to do work which Defendant knew or had reason to know to be likely to involve the creation of a nuisance, and is therefore subject to liability for harm resulting to Plaintiffs.

277.    Defendant's conduct described above constitutes a series of recurring temporary abatable private nuisances, which Defendant has failed to remedy within a reasonable period of time, and for which Defendant is liable.

278.    As a result of Defendant's liability for private temporary recurring abatable nuisance, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

279.    In accordance with Fed. R. Civ. P. 9(g), Plaintiffs hereby plead special damages including the diminished value and lost rental value of their homesteads and properties. Plaintiffs show that as homeowners and occupants of their family properties, they are of the opinion that one impact of Defendant's nuisance has been to reduce their property values. Numerous studies and reports have determined that hog CAFOs lower nearby property values. Plaintiffs allege that each of their homes and properties has lost significant value as a result of the proximity of Defendant's hogs and the stench and nuisance that they cause, to be shown at trial.   These damages are in addition to all other allowable damages which the jury may award.

## COUNT II: NEGLIGENCE

280.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

281.    At all pertinent times, Defendant had a duty of reasonable care as to the ownership, maintenance, and control of the hogs that it recurrently sent in groups to swine facilities.

282. During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facilities in a negligent manner which caused injury to the Plaintiffs.

283. Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of facilities and the management of the hogs renders Defendant independently liable for its breaches of its duty of due care with regard to the Plaintiffs.

284. Defendant has recurrently breached its duty of due care. As a direct and proximate result of Defendant's breach of its duty of care, the Plaintiffs have been injured.

285. During the pertinent times, Defendant knew or should have known that its actions and omissions were causing and contributing to cause harm to the Plaintiffs.

286. Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate Plaintiffs for the negligence of Defendant.

## COUNT III: PUNITIVE DAMAGES

287. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

288. Defendant's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

289. Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendant is properly liable for punitive damages in this action in that Defendant is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including

without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

290.    The recurring conduct, acts, omissions, negligence, and impropriety of the Defendant were willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiffs and justify an award of punitive damages.  Accordingly, Plaintiffs demand judgment against Defendant for punitive damages in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

A.      Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B.      Award the Plaintiffs punitive damages;

C.      Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses or fees to which they may be entitled by law; and

D.      Award the Plaintiffs such other and further relief as is just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted, this the 31st day of July, 2015.

By:    <u>s/Mona Lisa Wallace</u>
Mona Lisa Wallace
NCSB #9021
John Hughes
NCSB #22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC  28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the 31st day of July, 2015, I filed a true and correct copy of the above and foregoing **SECOND AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing (NEF) to all CM/ECF registered attorneys indicated on the NEF, including counsel for Defendant.

By:     s/Mona Lisa Wallace
        Mona Lisa Wallace, NCSB #9021
        John Hughes, NCSB #22126
        Wallace & Graham, P.A.
        525 North Main Street
        Salisbury, NC 28144
        Phone: 704-633-5244
        Fax: 704-633-9434
        mwallace@wallacegraham.com
        jhughes@wallacegraham.com