# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### Master Case No. 5:15-CV-00013-BR

IN RE: NC SWINE FARM        )
NUISANCE LITIGATION        )
<u>                               </u> )

**THIS DOCUMENT RELATES TO:**

*Anderson, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00183-BR
*Artis, et al. v. Murphy-Brown, LLC*, No. 7:14-cv-00237-BR
*Gillis, et al. v. Murphy-Brown, LLC*, No. 7:14-cv-00183-BR
*McGowan, et al. v. Murphy-Brown LLC*, No. 7:14-cv-182-BR
*McKiver, et al.  v. Murphy-Brown LLC*, No. 7:14-cv-00180-BR


## <u>EXPERT REPORT OF THOMAS N. HUBBARD</u>

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

My name is Thomas N. Hubbard.  I am the Elinor and H. Wendel Hobbs Professor of Management at the Kellogg School of Management at Northwestern University, where I have taught since 2005.  I am a professor in Kellogg's Strategy Department, where I teach business strategy classes in nearly all of Kellogg's programs.  I served as Chairman of the Strategy Department (then known as the Management and Strategy Department) from 2010-2012, and as Kellogg's Senior Associate Dean of Strategic Initiatives from 2012-2015.  Upon stepping down from my Senior Associate Dean position, I retained some of my responsibilities and I am currently Faculty Director of Kellogg's Strategic Initiatives.

Before accepting a position at Kellogg, I was a professor of economics and strategy at the Graduate School of Business at the University of Chicago from 1999-2005, a visiting professor of finance and economics at the Graduate School of Business at Columbia University during 2004-2005, and a professor of economics in the Department of Economics at the University of California, Los Angeles from 1995-1999.  In addition, I served as editor of the *Journal of Industrial Economics* from 2005-2009.  I am also a senior consultant at Charles River Associates International, an economic consulting firm with headquarters in Boston, MA.  I obtained a Ph.D. in economics from Stanford University in 1996, and an A.B. in economics (summa cum laude) from Princeton University in 1989.  I have attached a copy of my current curriculum vitae as Exhibit 1.

I am an expert in microeconomics, especially in the field of industrial organization, a field that examines how firms compete and how firms are organized.  I have a particular interest in the economics of vertical integration, and have several widely-cited pieces in academic journals on the subject, including papers in the very top journals in economics such as the *American Economic Review* and the *Quarterly Journal of Economics* that have been cited hundreds of times according to Google Scholar.  I also handled many papers on the topic when serving as editor of the *Journal of Industrial Economics*, and was commissioned to write a piece on the topic as part of the *New Palgrave* Dictionary of Economics, a standard research reference in the field.  I teach microeconomics-oriented business strategy courses at Kellogg that cover vertical integration, along with a host of other aspects of business strategy.  I am qualified to provide opinions on such issues.

I have been asked by the Plaintiffs in the North Carolina Nuisance Litigation to review certain documents and provide economic analysis and opinions as to the vertically integrated

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

nature of the hog production operations and how it relates to Plaintiffs' claims that they have been harmed in light of the relevant issues of the nuisance claim. Based on my review of the materials, I draw the conclusions expressed below.

## 1. **Background.**

I am advised that certain North Carolina homeowners and home occupants live near large concentrated groups of hogs.[1] These hogs are kept in special facilities known as confined animal feeding operations. Thousands of hogs are grown at these facilities. Some of these facilities are owned by Smithfield Hog Production Division.[2] Most, however, are owned by hog growers also known as "contract growers." These growers may be sole proprietorships, LLCs or corporations.[3] The North Carolina homeowners have sued the Smithfield Hog Production Division in this lawsuit.

---

[1]The most recent amended complaints in the five relevant cases are attached hereto as Exhibits 2-6. *See* Exhibit 2, *Anderson, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00183-BR, Second Amended Complaint dated July 31, 2015 (hereinafter Ex. 2 *Anderson* Second Amended Complaint); Exhibit 3, *Artis, et al. v. Murphy-Brown, LLC*, No. 7:14-cv-00237-BR, Second Amended Complaint dated July 31, 2015 (hereinafter Ex. 3 *Artis* Second Amended Complaint); Exhibit 4, *Gillis, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00185-BR, Third Amended Complaint dated July 31, 2015 (hereinafter Ex. 4 *Gillis* Third Amended Complaint); Exhibit 5, *McGowan, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00182-BR, Second Amended Complaint dated July 31, 2015 (hereinafter Ex. 5 *McGowan* Second Amended Complaint); Exhibit 6, *McKiver, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00180-BR, Second Amended Complaint dated July 31, 2015 (hereinafter Ex. 6 *McKiver* Second Amended Complaint).

[2] **Identification of corporate entities**: As discussed further in Section 2 below, the corporate entities discussed in this report include:

- Smithfield Hog Production Division is the d/b/a name of Murphy-Brown, LLC. Murphy-Brown, LLC changed its d/b/a name from Murphy-Brown to Smithfield Hog Production Division in 2015. Smithfield Hog Production Division is a limited liability company and a subsidiary of Smithfield Foods, Inc. Smithfield Hog Production division, as its name implies, produces hogs for the integrated enterprise.

- Smithfield Foods, Inc. is a corporation with a headquarters in Virginia. It is the United States' largest pork producer. It is a subsidiary of WH Group Limited.

- WH Group Limited is a limited liability company organized in the Cayman Islands. It changed its name from Shuanghui International Holdings Ltd. in 2014. Its global headquarters is in Hong Kong, its U.S. headquarters is Smithfield Foods in Virginia, and its Chinese headquarters is Shuanghui Development in China. (See http://www.wh-group.com/en/about/operations.php).

- Henan Shuanghui Investment and Development Co., Ltd. aka Shuanghui Development is a Chinese company. It is China's largest pork producer. It is a subsidiary of WH Group Limited. (See http://www.shuanghui.net/).

[3] Ex. 2, *Anderson Second Amended Complaint*, ¶¶ 95 (the Crooked Run CAFO was owned by Bandit 3, LLC), 102 (Willow Creek CAFO was owned by Godwin Twins, Inc.); Ex. 3, *Artis Second Amended Complaint*, ¶¶ 195 (three Paul Stanley CAFOs owned by Pagle Corp. or Greenwood Livestock, LLC), 198 (M&D Sow Farm was owned by

3

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Smithfield Hog Production Division contracts with hog growers, who in turn care for hogs until Smithfield Hog Production Division determines that they be brought to slaughter.[4] Throughout the process, including the time during which the hogs are cared for by the hog grower, the hogs are owned by the Smithfield Hog Production Division.[5] The contractual agreements between the Smithfield Hog Production Division and the contract growers provide little discretion with respect to how growers care for Smithfield's hogs.[6] Smithfield Hog Production Division provides the feed, medication, veterinarian services, and other support, and determines where and how its hogs are raised.[7] The contract grower's role is largely to carry out decisions that Smithfield makes, often as stipulated in Standard Operating Procedures otherwise known as the Grower Manual. For finishing farms like the Joey Carter or Kinlaw sites, the grower is paid a per-day rate based on the number of hogs raised.[8]

The Plaintiffs have brought a legal claim known as "private nuisance." They claim that the hogs owned by Smithfield Hog Production Division are concentrated in large numbers. They allege that the waste from the hogs and the odors and emissions from that waste do not stay on the confinements. Rather, foul odors and pollutants drift onto their homesteads. They claim a nuisance caused by a foul stench that comes onto their property. They also claim other nuisance effects such as from flies, truck noise and leakage from trucks.[9]

---

James Hope); Ex. 4, *Gillis Third Amended Complaint*, ¶¶ 1 (Sholar Farm owned directly by Murphy-Brown, LLC), 139 (same); Ex. 5, *McGowan Second Amended Complaint*, ¶ 184 (Joey Carter CAFO owned by Joey Carter); Ex. 6, *McKiver Second Amended Complaint*, ¶ 192 (Kinlaw Farms CAFO owned by Kinlaw Farms, LLC).

[4] *See*, for example, Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, February 13, 2009, MB104901000015-MB104901000044.

[5] Ex. 2, *Anderson Second Amended Complaint*, ¶¶ 95 (hogs owned by Murphy-Brown), 200 (same).

[6] Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, Section 4.9, February 13, 2009, MB104901000023 & 38 (grower to hold no pigs other than those owned by Murphy-Brown); Market Hog Finishing Agreement, Murphy-Brown, LLC and William Kinlaw, July 7, 2014, MB105401000004 ("Pigs… all of which are owned by OWNER"), MB105401000006 ("GROWER shall comply with OWNER's management procedures").

[7] Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, Section 3, February 13, 2009, MB104901000015-MB104901000029.

[8] Market Hog Finishing Agreement, Murphy-Brown, LLC and William Kinlaw, July 7, 2014, MB105401000003-MB105401000022, Exhibit D; Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, Section 3.4, February 13, 2009, MB104901000015-MB104901000029. Growers may also receive a performance bonus based on hogs' weight and/or "feed conversion." (The Kinlaw grower agreement is attached as Exhibit 9.)

[9] *See* Ex. 2, *Anderson Second Amended Complaint*, ¶¶ 3 (flies), 4 (trucks).

4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

I am advised that one factor in the nuisance claim is consideration of "the nature, utility and social value of the Defendant's operation."[10]  The Smithfield Hog Production Division, in conjunction with other divisions of its parent company, WH Group, operates as part of an integrated supply chain.  Working together they generate economic value through the production and sales of pork products that are consumed worldwide, but decisions made by the operation potentially generate social harms as well.

The rest of the report describes this in more detail, as follows:  I first describe the nature, utility, and social value and interests of the Smithfield Hog Production operation, both narrowly in the context of raising hogs and more generally in the context of its broader supply chain.  I then discuss the economic logic behind the allocation of ownership and decision rights between integrators and growers in this supply chain, and how this allocation can create greater economic value in the form of higher quality or lower cost pork products than other ways of organizing the supply chain would generate.  Finally, I discuss why, even though this organizational structure provides Smithfield Hog Production Division and its parent companies strong incentives to make decisions that maximize the economic value of its hogs, it does not provide Smithfield or its parents incentives to make these decisions in a way that accounts for the harm these decisions can impose on local residents.

### 2.  <u>The Nature, Utility, and Social Value of the Smithfield Hog Production Operation</u>

The Smithfield Hog Production Division is part of a supply chain that is highly vertically integrated and which produces pork and pork products.  Smithfield Hog Production Division was formerly known as Murphy-Brown, LLC.   Smithfield Hog Production Division is a limited liability company.

---

[10] This language comes from the NC jury instruction for nuisance. While I refer herein to the nature, utility, and social value of the Defendant's operation, the analysis and opinions contained herein are also applicable to other considerations I have been advised relate to nuisance claims, including due consideration to the interest of the plaintiff, the interest of the defendant, and the interest of the community, as well as the conditions under which the defendant's interference occurs.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Smithfield Hog Production Division is a wholly-owned subsidary of Smithfield Foods, Inc.[11]  Smithfield Foods, Inc. is a corporation with a headquarters in Virginia.  Smithfield Foods, Inc. is a wholly-owned subsidiary of WH Group Limited.

WH Group Limited is a limited liability company that is formed under the law of the Cayman Islands.  It changed its name from Shuanghui International Holdings Ltd. in 2014.[12] The WH Group Limited website states that it has a global headquarters in Hong Kong, its U.S. headquarters is Smithfield Foods in Virginia, and its Chinese headquarters is Shuanghui Development in Henan Province.[13]  WH Group Limited's shares are listed on the Hong Kong Stock Exchange.[14]  The WH Group bought Smithfield Foods, Inc. in 2013 and has 100% equity interest in the company.[15]  The WH Group is also the parent company of Henan Shuanghui Investment and Development Co., Ltd., the largest pork producer in China.[16]

Together, the WH Group's holdings, including Smithfield Foods, Inc. and the Smithfield Hog Production Division, constitute a vertically integrated enterprise for the production of pork products, extending from hog farming to the processing and distribution of fresh and packaged pork products (i.e., "from farm to fork") that people from around the world consume.[17]

The Smithfield Hog Production Division today, and its vertical integration with the WH Group and Smithfield Foods, Inc., is a product of organizational changes and production innovations that have transformed how pork products are supplied.  Many of these changes,

---

[11] Smithfield Foods, Inc. annual reports list Murphy-Brown as a wholly-owned subsidiary.  Smithfield 2016 Annual Report, p. 10 (discussing "our subsidiary, Murphy-Brown LLC"); WH Group 2015 Annual Report, p. 176 (discussing "Smithfield's wholly owned subsidiary, Murphy-Brown LLC").  I am advised that in discovery responses in the case, the Defendant clarifies that Smithfield Foods, Inc. owns John Morrell & Co. which owns Murphy-Brown, LLC.  *I.e.,* Smithfield Foods, Inc. owns Murphy-Brown via the intermediary entity.  See response to request to admission nos. 209 (admitting that "Smithfield Foods, Inc. owns John Morrell & Co."), 211 (admitting that "John Morrell & Co. is the sole member of Murphy-Brown, LLC.").

[12] *See* http://www.businesswire.com/news/home/20140121005322/en/Shuanghui-International-WH-Group.

[13] *See* http://www.wh-group.com/en/about/operations.php.

[14] WH Group 2015 Annual Report, p. 86: "WH Group Limited … was incorporated and registered as an exempted company with limited liability in the Cayman Islands under the Companies Law of the Cayman Islands.  Its immediate holding company is Heroic Zone Investments Limited … which is incorporated in the British Virgin Islands while its ultimate holding company is Rise Grand Group Limited, also incorporated in the British Virgin Islands. The Company's shares are listed on the Main Board of The Stock Exchange of Hong Kong Limited … on August 5, 2014" available here:  http://www.wh-group.com/en/ir/reports.php.

[15] Smithfield 2016 Annual Report, p. 3 (explaining how in September 2013, Smithfield was merged and is now a wholly-owned subsidiary of WH Group); WH Group 2015 Annual Report, p. 46 (noting "the acquisition of Smithfield in 2013").

[16] *See* WH Group corporate website, http://www.wh-group.com/en/about/profile.php (so stating).

[17] Presentation by Jona Smith, Assistant Director, Information Technology, Smithfield Hog Production Division, slide 5 ("We are farm-to-fork") available at http://docs.oracle.com/cd/E76387_01/edward/docs/Smithfield_Foods_Migration_Story_May18.pdf.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

especially in hog growing in North Carolina, have their roots in innovations catalyzed by Murphy Farms (a primary[18] predecessor company of Smithfield Hog Production Division) many years ago, which reduced the cost of hog production through the exploitation of economies of scale. In part drawing from innovations initially implemented by large poultry growers, these innovations include standard designs for large-scale hog growing operations and hog waste management. The company also began to divide the raising of hogs into separate stages, using different farms for breeding, growing, and finishing hogs, which exploited economies of specialization. In this system, Murphy Farms owned the hogs, and primarily used contract hog farms to raise them in ways that Murphy Farms stipulated. This way of organizing hog growing became highly successful, and Murphy Farms became the United States' largest hog producer, and was highly profitable.[19]

Smithfield Foods, Inc.'s 2000 acquisition of Murphy Farms, and the WH Group's 2013 acquisition of Smithfield Foods, Inc., created the vertically integrated enterprise that exists today, where Smithfield Hog Production Division is part of an enterprise that not only produces hogs, but also is integrated into the production of pork and pork products. However, many of the basic innovations initiated by Murphy Farms are the basis of how the Smithfield Hog Production Division currently organizes hog production.[20]

These innovations have made Smithfield Foods, Inc., in its own words, "a low cost producer of premium quality hogs," and a "leader in this field" which expects "to consistently outperform the overall industry."[21]

From an economic perspective, the social value of the Smithfield Hog Production Division's operation reflects both the economic value it creates and any harm that it generates.

Textbook economic analysis illustrates how businesses, including the Defendant's operation, generate economic value.[22] Businesses do so by producing products for which

---

[18] Over the years, Smithfield Hog Production Division acquired operations of predecessors including Murphy Farms, Inc., Brown's of Carolina, Inc. and others, leading to the entity name "Murphy-Brown, LLC." *See, e.g.,* Feb. 2003 statement by Don Butler ("Murphy-Brown LLC is the livestock production subsidiary of Smithfield Foods, Inc., the largest producer and processor of pork and pork products in the world with over 800,000 sow currently in production. The company was formed in 2001 to manage the wholly owned production units of Brown's of Carolina, Murphy Farms, and Carroll's Turkeys."). Available online at https://projects.ncsu.edu/project/swine_extension/swinereports/2003/ncporkconf/butler.htm.

[19] UNC TV "Wendell Murphy: Timeline," available at http://www.unctv.org/content/biocon/wendellmurphy/timeline.

[20] Smithfield 2013 Annual Report, p. 6.

[21] Smithfield 2016 Annual Report, p. 5.

consumers' willingness to pay for the product exceeds the economic costs of supplying the product. Economists call the difference between consumers' willingness to pay and these costs, aggregated across the units that are sold, "total surplus." (*See* Exhibit 7.) "Total surplus" is split between two groups: consumers and producers.

Economists call the economic value that is captured by consumers "consumer surplus." This is equal to the difference between each consumer's maximum "willingness to pay" – the most each consumer who purchases a product would be willing to pay it – and the product's price.[23]

Likewise, economists call the economic value that is captured by producers "producer surplus."[24] This is the difference between the price and the economic costs associated with the supply of the product.

To illustrate these concepts, consider the market for bread. Suppose a consumer has a maximum willingness to pay of $4.00 for a loaf of bread. Suppose the economic costs associated with supplying the bread (*e.g.*, growing the grain, making the bread, packaging and distributing it, etc.) are equal to $1.00. Then total surplus associated with this loaf of bread equals $3.00 ($4.00 minus $1.00). If the price of this loaf of bread is $2.00, then "consumer surplus" associated with this loaf of bread is $2.00 ($4.00 minus $2.00) and "producer surplus" is $1.00 ($2.00 minus $1.00).

The previous paragraph described total, consumer, and producer surplus associated with one loaf of bread. In practice, many loaves of bread would be produced by many producers and sold to many consumers. Total surplus in the market then would be the sum of the total surplus associated with each transaction: it would be the difference between consumers' willingness to pay and the economic costs of supplying the bread, summed up over all of the loaves of bread that are produced and sold. Consumer surplus would be the difference between consumers' willingness to pay and the price, summed over all of the loaves of bread that are sold. Producer surplus would be the difference between the price and the economic costs of supplying the bread, summed over all of the loaves of bread that are sold. Exhibit 8 illustrates this in a situation where consumers differ in their willingness to pay for loaves of bread (and the highest

---

[22] Mankiw, N. Gregory. *Principles of Economics*. Mason: South-Western Cengage Learning, 2008.
[23] *Id.*, p. 139.
[24] *Id.*, p. 143.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

willingness to pay is $4.00), and the incremental cost of supply increases as more bread is produced (with the lowest-cost loaf costing $1.00 to supply).

The Smithfield Hog Production Division generates economic value because it is part of a supply chain that supplies pork products to consumers whose willingness to pay for these products exceeds the economic costs of supply. Like in the bread example above, the "total surplus" in this market – and thus the benefit associated with the operation – is split between two groups. One group is consumers of pork products, who capture "consumer surplus." The other group is the owners of WH Group Limited (and any unaffiliated participants in the supply chain), who capture the "producer surplus."

In principle, producer surplus can flow to any or all entities who participate in a product's supply chain in the form of profits or what economists call "economic rents."[25] However, in this supply chain it appears that very little of the producer surplus accrues to growers or their employees. Growers' profits appear to be quite low and there is no evidence that their low-wage employees are paid significantly more than it would take to lead them to work at their jobs.[26] Deposition testimony indicates that employees' wages are on the order of $12-15 hour with limited if any benefits.[27] Some share of these wages may be a "compensating differential" – a premium employees receive for working in unpleasant conditions. Much work at a hog grower involves unskilled labor, and hog growers operate according to standard specifications and procedures laid out by Smithfield Hog Production Division.[28]

In contrast, financial reports indicate that much more of the producer surplus accrues to the WH Group (including its Smithfield Foods, Inc. subsidiary listed as its American headquarters[29]), which controls other relevant elements of the supply chain.[30]

---

[25] An "economic rent" is payment that exceeds the amount it takes to draw an asset into its current use. For example, if a worker would be willing to accept a job at $8.00 per hour, but is paid instead $10.00 per hour, then $2.00 of his or her wage is an economic rent.

[26] In 2012, the USITC reported average annual wages for swine growers to be $32,992. *See,* U.S. International Trade Commission, Pork and Swine, Industry and Trade Summary, October 2014, p. 25. As of September 2016, the unemployment rate reported in North Carolina was 4.7%. North Carolina Economy at a Glance, US Bureau of Labor Statistics, http://www.bls.gov/eag/eag.nc.htm.

[27] Deposition of Dean Hilton, November 10, 2016, pp. 66-67; Deposition of Bartolo Myron, September 5, 2016, pp. 23-24.

[28] The building specifications, sophisticated feed ingredients and hog genetics, and operational procedures that are used in hog growing may be necessary for efficient operations, but these were developed and supplied by Smithfield, not the hog growers or their employees.

[29] *See* http://www.wh-group.com/en/about/operations.php.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

In this regard, the 2015 Annual Report of the WH Group reports operating profits of $1.6 billion. Its Smithfield Foods, Inc. subsidiary – which produces hogs, fresh pork and packaged meats -- reported net income, after taxes, of $452 million in 2015.[31]

Smithfield Foods, Inc.'s sales of fresh and packaged pork products rely heavily on the hogs produced by its Smithfield Hog Production Division, over 75% of which are inputs to Smithfield Foods, Inc.'s pork products.[32] Smithfield Foods, Inc. executive Don Butler at his deposition agreed that the profits associated with "the efforts of Murphy-Brown and Smithfield" accrue to the shareholders of the WH Group.[33] The evidence that I have seen thus indicates that most, if not nearly all, of the producer surplus in this supply chain is appropriated by the WH Group (including its Smithfield Foods, Inc. subsidiary), not by growers and their workers.

Most of the beneficiaries associated with the operations of Smithfield Hog Production Division – the recipients of the consumer and producer surplus – are consumers or owners who are not proximate to the hog grower facilities that are the focus of this case. The ultimate goods or products are the pork products. Although some consumers of the ultimate pork products may live in the areas around these facilities, the vast majority live elsewhere.

The Smithfield Hog Production Division is part of a supply chain that serves consumers across the United States as well as other countries, particularly China.[34] Indeed, reports from the business press indicate that the WH Group bought Smithfield Foods, Inc. for the purpose of increasing the supply of pork products to Chinese consumers, and to "accelerate its global expansion" more generally.[35] These press reports echo statements made by Smithfield Foods,

---

[30] WH Group operating profit for 2015 was reported to be $1.557 billion. *See,* WH Group Limited 2015 Annual Report, p. 4; Corporate Profile, WH Group, www.wh-group.com/en/about/profile,php, "WH Group is the largest pork company in the world, with number one positions in China, the U.S. and key markets in Europe."
[31] Smithfield 2016 Annual Report, p. 26.
[32] Smithfield 2016 Annual Report, p. 4.
[33] Don Butler deposition, November 29, 2016. p. 143.
[34] The Smithfield 2016 Annual Report states that its "Fresh Pork Segment produces a wide variety of fresh pork products in the U.S. and markets them nationwide and to numerous foreign markets, including China, Japan, Mexico, Russia, and Canada," and that "export sales comprised approximately 25% of the Fresh Pork segment's volumes" (pp. 3-4).
[35] *See* Kesmodel, David. "Shuanghui to Boost Smithfield Exports as First Priority." *Wall Street Journal*, September 26, 2013, available at http://www.wsj.com/articles/SB10001424052702304795804579099421443260970. From the article:

> Shuanghui International Holdings Ltd. intends to quickly ramp up pork exports from the U.S. as its top priority after Thursday's closing of its $4.7 billion acquisition of Smithfield Foods Inc., senior executives said.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Inc. executive Don Butler in an open letter to the NC Pork Council in June 2013. In this letter, Butler stated that the WH Group acquisition would result in "expanding export opportunities for pork raised in this country;" in deposition he confirmed that he was referring to export opportunities to China.[36] Supply to China is likely to increase in the future with Smithfield Foods, Inc.'s sister company Shuanghui Development's opening of a new "American-style packaged meats factory," which the WH Group announced "marked the official entry of the Smithfield brand into China."[37] Furthermore, hog production costs are currently lower in the U.S. than in other parts of the world, including China. The WH Group's 2015 Annual Report indicates that in late 2015, hog prices in the U.S. were half that in China, making it advantageous for Chinese pork producers to import pork from the U.S.[38]

According to corporate reports and disclosures, the owners of the Smithfield Hog Production Division – the shareholders of its parent company, the WH Group – are largely based outside of the United States, and in any case are not concentrated in the area near the facilities.[39] Most members of the WH Group's board of directors are based in China.[40] Major shareholders include foreign investors such as CDH Shine, Rise Grand, Heroic Zone and others.[41] These major shareholders are not entities local to North Carolina. CDH is a Chinese private equity

---

Shuanghui and Smithfield—whose tie-up marks the largest Chinese takeover of a U.S. company—already have begun integrating their international sales staffs. The global trading unit, centered in Hong Kong, will seek to expand sales of Smithfield's pork in China and other markets by leveraging Shuanghui's distribution network, executives said.

"For this acquisition, we have one guiding principle: to accelerate Smithfield's global expansion," Wan Long, the 73-year-old chairman of Shuanghui, said in a joint interview with executives from the two companies this week. "We will provide better organization and distribution of Smithfield's products to all parts of the world."

[36] *See* http://www.ncpork.org/a-letter-from-don-butler-on-the-smithfield-merger/. Butler deposition. pp. 199-202.
[37] WH Group 2015 Annual Results, March 2016, p. 16.
[38] WH Group 2015 Annual Report, p. 20.
[39] *See e.g.,* "Inside Information" Announcement, WH Group, August 25, 2016, available at http://file.irasia.com/listco/hk/whgroup/announcement/a160825.pdf (listing major shareholders).
[40] The board consists of Wan Long, Jiao Shuge, Lijun Guo, Zhang Taixi, Kenneth Sullivan, You Mu, Huang Ming, Lee Conway Kong Wai and Lau Jin Tin Don. See http://www.wh-group.com/en/about/leadership.php.
[41] See, "Inside Information" Announcement, WH Group, August 25, 2016, available at http://file.irasia.com/listco/hk/whgroup/announcement/a160825.pdf. Per that announcement, controlling shareholders included CDH Shine and Shine II, Heroic Zone Investments and Rise Grand Group. Each was a limited liability company incorporated under the laws of the British Virgin Islands. See also, Wang, Huifeng, "Analysis of Investment Prospects for Chinese Private Equity Firms in the U.S. Market", June 2015, pp. 28-33 (describing controlling shareholders); Barboza, David, Chinese Bid for U.S. Pork Had Links to Wall Street, New York Times, June 2, 2013 (same), available at http://www.nytimes.com/2013/06/03/business/global/behind-the-chinese-bid-for-smithfield-foods.html.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

firm, Rise Grand is partly owned by WH Group Chairman Wan Long, and Heroic Zone is controlled by WH Group senior management.[42] A large share of the producer surplus therefore flows to foreign shareholders. Thus, unlike a situation where an individual farmer raises and slaughters hogs, and produces bacon and pork chops that are only sold at local restaurants (as in "farm-to-table" arrangements), the consumer and producer surplus associated with these operations is appropriated almost entirely by individuals who are distant from the operations themselves.

As noted above, the Smithfield Hog Production Division's operation, and decisions associated with this operation, may inflict harm on others. As with some other businesses, there can be "externalities" associated with the production of pork products at various stages in the supply chain such as the pollution of air, water or soil that are not internalized by consumers or producers. Such "externalities" are a consequence of decisions made by entities in the supply chain, including where to raise hogs, how many hogs to concentrate at one location, how aggressively to contain pollution, and how aggressively to mitigate pollution's effects. Unlike the economic value that the Smithfield Hog Production Division generates, any harms that it generates are likely to be localized and near production facilities.

Who is making decisions that lead to these harms can differ, depending on how the supply chain is organized. I turn next to an economic analysis of the allocation of decision rights in this context.

### 3. <u>Vertical Integration and the Allocation of Ownership and Decision Rights</u>

How ownership and decision rights should be allocated across parties is a central issue in the economics of organization. Indeed, 2016's Nobel Prize in economics was given to two economists – Oliver Hart and Bengt Holmstrom – in part for their fundamental contributions to economic analysis of this issue.[43]

---

[42] CDH is a "Chinese private equity firm." Reuters article, http://www.reuters.com/article/wh-group-cdh-share-sale-idUSL3N1B60TU. Rise Grand Group Ltd. is an entity partly owned by WH Group's chairman, Wan Long. *See* https://www.chinamoneynetwork.com/2016/08/25/cdh-investments-seeks-916m-partial-exit-from-wh-group. Heroic Zone Investments Limited is a company controlled by the senior management of WH Group, and as of August 2016 owned over 30 percent of the shares. https://www.paulhastings.com/news/details/?id=202eea69-2334-6428-811c-ff00004cbded.

[43] "The Prize in Economic Sciences 2016 - Press Release". Nobelprize.org. Nobel Media AB 2014. Web. 5 Dec 2016. <http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2016/press.html>. My work with

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

This issue is closely related to the issue of vertical integration.  A company that vertically integrates buys out another member of its supply chain.  This reallocates ownership and decision rights in the sense that the acquiring firm has ownership and decision rights that it previously did not have, and the acquired firm no longer exists as an independent economic entity.  When Smithfield Foods, Inc. acquired Murphy Farms in 2000, it acquired control rights over Murphy Farms' assets.[44]  Although Murphy-Brown, LLC (now known as Smithfield Hog Production Division), Murphy Farms' successor company, continues to exist as a legal entity, it does not exist as an independent economic entity – rather, it is part of Smithfield Foods, Inc. which itself is part of WH Group Limited.  There is today a single economic entity, namely WH Group.[45]

One can see this in the financial reports.  Smithfield Foods, Inc.'s business, and the relevant profits from this business, includes its entire operations including those of all of its subsidiaries.  Smithfield Foods, Inc. characterizes hog production as one of the five segments of its business (others include "Fresh Pork," and "Packaged Meats"), not a separate economic

---

George Baker on how ownership and decision rights are allocated in the trucking industry is cited in the Nobel Prize announcement as empirical evidence that supports Hart's and Holmstrom's theoretical work.

[44]As Smithfield Foods, Inc.'s Form 10-K for the period ending April 30, 2000 describes, p. 3, "[i]n January 2000, the Company acquired Murphy Family Farms and certain related companies and assets, including approximately 345,000 sows."   The Murphy family retained some hog farms.  *See* UNC-TV Wendell Murphy timeline, http://www.unctv.org/content/biocon/wendellmurphy/timeline ("When the family business sold to Smithfield Foods in 2000, many thought the Murphy family's chapter on pork production had closed. Not so. The Murphy's retained some of the family-owned farms with the understanding that they would raise hogs under contract for Smithfield Foods.").

[45] Concepts of single economic entity are found throughout the law and economics area.  For example, a version of the single economic entity concept acts as a defense to antitrust conspiracy liability, on the grounds that an entity cannot conspire with itself.  In the antitrust field, our Supreme Court has stated:

> A division within a corporate structure pursues the common interests of the whole rather than interests separate from those of the corporation itself; a business enterprise establishes divisions to further its own interests in the most efficient manner…. For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-73 (1984).

13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

entity. Smithfield's discussion of its business (properly) treats hog production as a division of a larger, vertically integrated business.[46]

Likewise, when the WH Group acquired Smithfield in 2013, it acquired control rights over Smithfield Foods, Inc.'s assets, and Smithfield Foods, Inc. ceased to exist as an independent economic entity. From an economic perspective, these acquisitions led this supply chain to be highly vertically integrated, where one firm – the WH Group – controls stages of the supply chain that were previously controlled by independent firms. Smithfield Foods, Inc. used to be an independent producer of pork and pork products, and Murphy Farms used to be an independent producer of hogs; now, Smithfield Foods, Inc. and its Hog Production Division are parts of a single, much larger firm (the WH Group) that has ultimate control over these stages of production.

Ownership of an asset generally provides an entity both control rights and "residual claims" on the asset. For example, if I own a car, then I have control rights over it (for example, I am able to decide where to drive it), and if I decide to sell the car I receive the proceeds from the sale. If I use a car that I do not own, I do not have the same control rights or residual claims. For example, if I rent a car, the rental car company can restrict how I use it (for example, I might not be allowed to drive it off road or out of the country, or to use it for commercial purposes), and I do not receive the proceeds if the car is sold – the rental car company does.

Providing the same entity both control rights and residual claims tends to be desirable relative to providing control rights to one entity and residual claims to another.[47] If one were to give control to one entity but residual claims to another, the control rights might not be exercised in a way that preserves the value of the asset. As I discuss in my academic work on the trucking industry, providing those who have control rights over trucks (sometimes a driver, sometimes a trucking company or a firm's "private fleet") the residual claims on them as well, encourages them to utilize trucks in ways that recognize how the way they utilize their trucks affects the trucks' resale value.[48]

---

[46] Smithfield 2016 Annual Report, p. 3. Similarly, the WH Group reports operating profits for hog production as a division of a larger, vertically integrated business. *See* WH Group 2015 Annual Report, p. 21.

[47] This is sometimes referred to as the problem of the "separation of ownership and control;" see Jensen, Michael C. and William H. Meckling. "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure." *Journal of Financial Economics,* Vol. 3 (1976): 305-360.

[48] Baker, George P. and Thomas N. Hubbard. "Contractibility and Asset Ownership: On-Board Computers and Governance in U.S. Trucking." *Quarterly Journal of Economics*, Vol. 119, Iss. 4, 2004, pp. 1443-1479.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Similarly, it is generally desirable for the owner of an asset to have rights to decisions that would affect the value of the asset more generally.  If I own a car (or a truck driver owns his or her truck), it is desirable for me also to have the right to make decisions regarding its maintenance, what fuel to use, when oil is changed, where it is kept (*e.g.*, in a garage or out in the weather?) and so on, because ownership gives me the incentive to make these decisions in a way that recognizes how these decisions affect the car's value, balancing for example the costs and benefits of maintenance.

Moving now to the context of raising hogs, it therefore tends to be desirable for the owner of the hog also to have the rights to make decisions that would affect the hog's value more generally.  One would expect this to include what the hogs are fed, when diets are changed, who medicates them, how they are medicated, how they are transported, and when they are slaughtered.  It would also include the right to decide where the hog is kept, because my understanding is that where the hog is kept affects the probability that it becomes sick or dies, which decreases its value.[49]

A situation where the integrator (*e.g.*, Smithfield Hog Production Division) owned the hog, but the grower had these decision rights, would lead to inefficiencies, because the grower would not have the same incentives with respect to these decisions as the integrator.  The grower might have an incentive to use cheaper feed, less effective medication, to locate the hogs in a place that exposes the hog more to disease, to have the hog slaughtered earlier or later than it is efficient to do so, and so on, because the grower would not fully appropriate the benefits associated with maintaining or increasing the hog's value.

My understanding is that the Smithfield Hog Production Division (and, ultimately, the WH Group) both owns the hogs and retains important rights to decisions that affect the hogs' value, including how they are fed, what they are fed, their medication, how they are transported, where they are kept, what other animals they are kept around, and where and when they are slaughtered.  Smithfield Hog Production Division's contract with the Kinlaw Farms hog grower illustrates this.  (Exhibit 9).[50]  Although the hog grower is generally a separate company from the Smithfield Hog Production Division, the hog grower's role is to *carry out* many of these

---

[49] Ramirez and Zaabel, Swine Biological Risk Management, Center for Food Security and Public Health, March 2012, p. 9 ("The farm/unit location is likely the single most important risk factor for new disease introduction"), available at http://www.cfsph.iastate.edu/pdf/swine-biological-risk-management/.

[50] Other grower agreements that I have reviewed include similar provisions.  (Exhibit 10).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

decisions, not to make them itself. These decisions are made by the integrator, not the grower, and for good economic reasons – ownership of the hog provides the integrator, but not the grower, strong incentives to make these decisions in a way that accounts for how they affect the value of the hog.

In some circumstances, it may be desirable for the grower to both own the hog and have these other decision rights, rather than the integrator having them. A different way of organizing the supply chain would be for growers to obtain (or breed) hogs, own them, raise them, then sell them to Smithfield Hog Production Division (or another firm) for slaughter and processing once they are raised. In such a circumstance, it would be desirable for the grower to have the decision rights that I describe above. My understanding is that this way of organizing the supply chain, which involves less vertical integration, is currently uncommon in hog farming, though it may have been more common in the past.[51]

My understanding from the corporate disclosures and reporting as well as comments in the media by Smithfield Foods, Inc. and WH Group is that they consider an organizational structure where they, and not outside growers, own the hogs and the decision rights associated with their care desirable because it allows Smithfield Foods, Inc. and WH Group to better control the quality and other attributes of the pork products that they ultimately sell.[52] For example, the pork products they sell have qualities that reflect what the hogs are fed, how they are medicated, and their genetic line.[53] How hogs are bred, fed and medicated affects the attributes of the pork that is ultimately produced. If instead Smithfield Foods, Inc. bought grown hogs "on the hoof"

---

[51] Robbins, William. "Farmers Turn to Hog Raising for a Fee". *The New York Times*. May 29, 1988, available at http://www.nytimes.com/1988/05/29/us/farmers-turn-to-hog-raising-for-a-fee.html; Leonard, Christopher. *The Meat Racket: The Secret Takeover of America's Food Business*. Simon & Schuster, February 2014; Nowlin, Michelle B., "Sustainable Production of Swine: Putting Lipstick on a Pig?" *Vermont Law Review*, Vol. 37, 2013, pp. 1079-1141, available at http://scholarship.law.duke.edu/faculty_scholarship/3111/.

[52] "Food Quality & Safety," WH Group, available at: http://www.wh-group.com/en/safety/quality.php: "We believe that our vertical integration between hog production and fresh pork and packaged meat production provides us unique competitive advantages with regard to quality control." See also, "WH Group Global Offering," WH Group, April 15, 2014, available at: http://www.wh-group.com/en/ir/announcements/a140415a.pdf, at p. 1: "Our unique, vertically integrated, global platform distinguishes us from our competitors. We are the undisputed leading pork company in China, which alone accounted for over half of global pork consumption in 2012 and is expected to represent over 80% of global pork consumption growth over the next five years, according to Frost & Sullivan. Smithfield, our wholly owned subsidiary, is the industry leader in U.S. pork production and is the world's largest pork exporter, with compelling cost advantages."

[53] *See* Smithfield 2016 annual report, p. 4 ("We own certain genetic lines of breeding stock, under the name Smithfield Premium Genetics (SPG). The Hog Production segment makes extensive use of these genetic lines.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

from growers who could decide for themselves how the hogs were fed and medicated, Smithfield Foods, Inc. would have less control of the attributes of the pork products it ultimately sells.

4. **<u>The WH Group and Smithfield Foods, Inc. Have Economic Incentives to Exercise Decision Rights in a Way that Maximizes the Economic Value of Their Hogs, But Do Not Have the Same Incentives to Account for the Harm Associated with Their Decisions</u>**

The WH Group, like other companies, has strong economic incentives to maximize the profits that it generates from its and its subsidiaries' operations. One way in which Smithfield's Hog Production Division contributes to the WH Group's profits is by maximizing the value of the hogs, net of the costs incurred in raising them. I explained above how owning the hogs and retaining important decision rights associated with the hogs' care facilitates this goal, by ensuring that the entity making these decisions is the beneficiary when these decisions are made well: if these decisions are made well, they will be reflected in the value created from the hog.

However, while market forces provide Smithfield Foods, Inc. and its ultimate parent company WH Group strong incentives to make decisions, including where hogs are raised, how production is organized, and what hogs are fed, in a way that attends to the economic value of the hogs (and the costs of raising them), they do not provide Smithfield Foods, Inc. or its parent company WH Group strong incentives to do so in a way that attends to the harm such decisions can inflict on nearby homeowners.

As I describe above, one important decision that Smithfield Hog Production Division makes is where its hogs should be raised. My understanding is that Smithfield Hog Production Division has various options, some of which have a greater potential for generating externalities (*i.e.*, environmental and other harm) than others.

My understanding is that Smithfield Hog Production Division is *not* indifferent with respect to where its hogs are raised. For example, as illustrated in its contracts with hog growers, Smithfield Hog Production Division does not wish its hogs to be raised near others' hogs, because it is concerned that diseases from these other hogs might be contracted. Smithfield Hog Production Division's contract with Kinlaw Farms has a biosecurity provision that states that no

17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

other swine should be within a one-mile radius of the hogs.[54]  I am advised other grower contracts include similar terms.[55]  However, these contracts do not manifest a similar concern about whether their hogs are raised near where humans live.

Thus, as reflected in the one-mile provision in the Kinlaw grower agreement, the fact that the presence of other unapproved hogs might affect the value of Smithfield Hog Production Division's hogs provides Smithfield Hog Production Division a strong economic incentive to choose hog farms that are not extremely close to other hog farms.  However, the same economic incentives do not apply to whether Smithfield Hog Production Division chooses to place its hogs at farms that are close to where humans live, because being raised close to humans does not have a direct effect on the value of Smithfield Hog Production Division's hogs.  Its main effect is on the humans, and Smithfield Hog Production Division does not have a strong incentive to account for this effect when making its decision where its hogs should be raised.[56]

Kinlaw Farm owner Billy Kinlaw's deposition testimony illustrates how these incentives determined where Kinlaw developed his hog farm.  In deposition, Kinlaw first described that he had another piece of land that would have been good for a hog operation but a Murphy-Brown representative told him that it was unsuitable because "it was too close to a Murphy-Brown multiplier farm."  Eventually he found another plot of land and took the Murphy-Brown representative there who said it was acceptable.[57]  I am advised that aerial views of the properties in question reflect that the first plot of land, which Murphy-Brown rejected, was located further away from people.  The second parcel, which Murphy-Brown approved, was located closer to people.

The text of the grower contracts, and other available information, indicates that Smithfield Hog Production Division also cares about the location of its hogs because location affects production costs in various ways.  For example, my understanding is that Smithfield Hog

---

[54] *See*, Market Hog Finishing Agreement, Murphy-Brown, LLC and William Kinlaw, July 7, 2014, MB105401000003-MB105401000022, Section 10.

[55] *See also*, the Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, February 13, 2009, at p. MB104901000023, Section 4.9 (stating grower cannot allow other swine to come within 1,000 feet of finishing floor of hog site).

[56] The Kinlaw grower contract's biosecurity provision (Ex. 9) states that the grower cannot keep other swine within a mile without approval.  At the same time, I am advised that the majority of the neighbors who are suing reside less than half a mile from the subject hog farms.

[57] Kinlaw deposition, p. 11-14.  Along with advising Billy Kinlaw regarding its location, Murphy-Brown designed, engineered, and handled the permitting for the Kinlaw Farm.  (Billy Kinlaw depo. pp. 39-41).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Production Division's hogs are normally born at one facility and raised at other facilities (such as at the growers' facilities), sometimes moving from facility to facility at different growth stages. If Smithfield Hog Production Division used a grower that was far from other facilities, this would increase its transportation costs of moving hogs from facility to facility. Similarly, to the extent that Smithfield Hog Production Division uses the same staff (*e.g.*, veterinarians, inspectors) at different growers, a network of far-flung facilities would lead to higher transportation-related costs associated with this staff, and would require more staff to care for the same number of hogs. Finally, Smithfield Hog Production Division has an incentive to use facilities that are near depots where it procures feed and the slaughterhouses to which it delivers its hogs for processing.[58] These factors provide Smithfield Hog Production Division an economic incentive to use growers that are relatively close to other parts of its supply chain, while also separated to limit the spread of disease. One would expect Smithfield Hog Production Division to account for these factors when choosing where its hogs should be raised, but not other factors associated with harm to others.

These decisions determine important aspects of how Smithfield Hog Production Division's supply chain is organized, including both where production takes place and whether hogs are moved from facility to facility in the process. Smithfield Hog Production Division has an incentive to organize production in this way if it increases the economic value of its hogs, or lowers its costs of raising them. However, organizing production in a way that leads hogs to move more frequently between facilities can create harms to others in the form of more odor, flies, noise, and so on – particularly to those who live near facilities or the roads connecting them. While Smithfield Hog Production Division has a strong market incentive to organize production in a way that maximizes the economic value that its operation generates, it does not have a strong market incentive to organize production in a way that accounts for the harms associated with its production decisions.

Smithfield Hog Production Division makes other decisions that affect the degree to which its hogs generate pollution and the degree to which this pollution creates harm to others. For example, one source of the odor and pollution of which the neighbors complain is the hogs' urine

---

[58] Smithfield Foods, Inc. owns the largest pork slaughterhouse in the world in Tar Heel, NC. *See* https://www.youtube.com/watch?v=1s8Vt-Q8N80. *See also* Weigl, Andrea, "Gone to Market," August 13, 2008, The Raleigh News & Observer.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
Case 7:14-cv-00183-BR    Document 115-2    Filed 01/28/19    Page 20 of 28

and excrement.  I experienced this personally when I toured the Sholar site on Thursday, December 15, 2016.  The facility design (introduced by Smithfield Hog Production Division's predecessor, Murphy Farms) contemplates holding hundreds of hogs in each hog shed, with multiple sheds at the site.  The manure goes to underfloor holding pits and then to open lagoons, and then is applied to fields at the site.  I could easily smell strong odors associated with the farm when I stood off-property in front of neighbors' homes.

While it is outside of my own area of expertise, my understanding is that other experts will testify that controls and waste systems that reduce emissions and odor are available, but are not being used at Sholar or other sites that use the "lagoon and spray" system.  Smithfield Hog Production Division could make the decision to place its hogs at sites that have better waste management systems, or could install or fund better systems at the sites it uses.  However, as it stands it does not do so except in rare instances.[59]

Furthermore, my understanding is that the amount and nature of this pollution is influenced by hogs' genetics, diet and medications.[60]  Smithfield Hog Production Division has a strong incentive to decide how hogs are bred, fed and medicated in a way that attends to hogs' market value (and the cost of raising them), but not harms associated with additional pollution.

Smithfield Hog Production Division also decides the standards to apply to its growers with respect to odor control, and how closely to enforce these standards.  The Kinlaw contract states that Smithfield Hog Production Division requires the grower to keep the hogs at least one mile away from other hogs, presumably due to the fear of contamination.  But, there is no provision that the hogs be kept at least that far away from neighbors, despite what Plaintiffs say is well-documented evidence that neighbors are affected.  Smithfield Hog Production Division could offer its growers particular abatement technologies to be applied in situations where harms are more likely, such as when there are homes nearby.  The fact that Smithfield Hog Production

---

[59] As an example, I am advised that one Smithfield Hog Production Division site in North Carolina is Kenansville Farm in Faison NC.  The company had a vendor install an improved waste system to reduce odors and emissions. See Environmental Fabrics, Inc. press release describing installation of covered lagoon and biogas system in which "odors are destroyed." *See* http://www.environmentalfabrics.com/docs/Kenansville%20Farms.pdf.  Surveys of potential superior technologies are found in various publications, for instance Schiffman, S.S., Williams, C., 2005. Science of odor as a potential health issue. Journal of Environmental Quality 34, 129-38.  Available online at https://static1.squarespace.com/static/54806478e4b0dc44e1698e88/t/55e0c69fe4b09852462992d9/1440794271771/SchiffmanOdorsJEQJan05.pdf.

[60] It is my understanding that other witnesses and evidence presented in this case will support the proposition that manipulation of hog genetics, feed and medication can affect the amount of odor and other effects.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Division does not do so, but instead requires no greater standards and no different technologies when its hogs are raised at farms that are close to homes and other businesses than when they are farther from homes and other businesses, supports my broad point that it does not have strong incentives to make decisions in a way that accounts for these harms.[61]

The standards that the Smithfield Hog Production Division applies to its growers, and to its internal production, sometimes reflect broader, corporate-level decisions; as I describe earlier, Smithfield Foods, Inc. (and, in turn, the WH Group) has control rights over the Smithfield Hog Production Division and therefore has the right to make such decisions. For example, in response to large customers' requests, Smithfield Foods, Inc. decided to phase out the use of gestation crates in its Hog Production Division, and provided incentives that would lead contract growers to utilize "group housing" for sows at their facilities.[62] Smithfield Foods, Inc. asserts that vertical integration allows it to drive such changes as the phase-out of ractopamine, a feed additive that is banned in many countries but not in the United States, through its supply chain.[63] Smithfield Foods, Inc. has an economic incentive to make and fund these changes because it expects these changes to lead to greater demand, higher revenues, and higher profits associated with the pork it sells. In contrast, it does not have as strong incentive to impose higher standards that would diminish harms associated with how its hogs are raised.

In making these decisions, it is in Smithfield Foods, Inc.'s economic interest to consider the effect these decisions had on its *overall* profits, not the individual profits of one or more of its divisions. Although in some cases Smithfield Foods' internal accounting could report such initiatives as lowering the profits of one of its divisions and raising the profits of another, the appropriate economic perspective is one where Smithfield Foods, Inc. (and similarly, the WH Group Limited) is a single economic entity.

From an economic perspective, one would expect any harms to be felt by affected parties in various ways, including their comfort, use and enjoyment of their property and any decreases in the value of their properties. My understanding is that all or most of the neighbors who are suing either themselves lived at their current address well before Smithfield Hog Production

---

[61] I am advised that no facts have been offered in the case to reflect that Smithfield provides growers known to be located near homes with greater pay, support or controls to manage environmental issues, nor that the company specifies any provisions in its contracts or SOPs on environmental issues that are more stringent for operations that are located close to residences.

[62] Smithfield 2016 Annual Report, p. 54.

[63] Smithfield Foods, Inc. website, http://www.smithfieldfoods.com/our-brands.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

Division (or its predecessors) decided to raise hogs near their property or, live at homes and on homestead properties that can be traced via parents and family ancestors to pre-date either Smithfield Hog Production Division's decisions or the hog farms themselves. Smithfield Hog Production Division's decisions, including decisions regarding where to raise its hogs, how to organize production, what to feed its hogs, and what standards to apply to its growers, have the potential to harm these individuals by injuring their use and enjoyment of their property that they owned before either these decisions were made or neighboring properties became hog farms.

Economists have long recognized that, when companies' activities generate harms in the form of pollution or other negative externalities, companies' decisions may not reflect or account for the social cost of these harms, and need not lead to economically efficient outcomes.[64] Smithfield Hog Production Division's and Smithfield Foods, Inc.'s decisions are geared to maximizing the value of its hogs, net of the costs incurred in raising them. These decisions, along with innovations in how hogs are produced, have led Smithfield Foods, Inc. to be in its own words a "low cost producer," and have led it to be cost-effective for the WH Group increasingly to import pork from the United States to serve Chinese customers rather than raise and process hogs in China; as I mention above, hog production is currently much less expensive in the United States than in China. The enterprise's decisions, however, do not currently reflect the harm they impose on others, and thus what economists call the "social costs" of its operations. If the enterprise made decisions that accounted for these "social costs," this is likely to lead to a more economically efficient outcome, even if it led to somewhat reduced profits for the WH Group. It also may improve the long-term sustainability of the industry in states like North Carolina.[65]

**Additional disclosures pursuant to Federal Rule 26:**

I provide the following disclosures:

---

[64] Mankiw, N. Gregory. *Principles of Economics*. Mason: South-Western Cengage Learning, 2008, pp. 205-207.
[65] Schiffman, *supra,* at pp. 135-36 ("Sustainable agriculture requires production and distribution systems that minimize adverse effects on health, safety, and the environment. Practices must be economically viable, environmentally sound, and socially responsible. This includes reduction or elimination of odorous aerial pollution that evokes health complaints and impairs quality of life in neighboring communities.").

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

- A complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them: This information is provided above in the main body of my report.

- Any exhibits that will be used to summarize or support them: A list of exhibits is provided below. In addition, I may use excerpts from the materials cited above in the footnotes to my report, as exhibits for purposes of elucidating my testimony.

- The witness's qualifications, including a list of all publications authored in the previous 10 years: See Exhibit 1, my current CV, as to qualifications. Publications authored in the previous 10 years include:

    o "The Return to Knowledge Hierarchies" (with Luis Garicano), *Journal of Law, Economics and Organization,* November 2016, 653-684.

    o "Learning About the Nature of Production From Equilibrium Assignment Patterns" (with Luis Garicano), *Journal of Economic Behavior and Organization*, September 2012, 136-153.

    o "Equilibrium, Outcomes, and the Economics of Organization," *International Journal of Industrial Organization*, July 2010, 359-361.

    o "Specialization, Firms, and Markets: The Division of Labor Within and Between Law Firms" (with Luis Garicano), *Journal of Law, Economics, and Organization*, October 2009, 339-371.

    o "Empirical Research on Firms' Boundaries," *Canadian Journal of Economics*, May 2008, 341-359.

    o "Managerial Leverage Is Limited by the Extent of the Market: Theory and Evidence from the Legal Services Industry" (with Luis Garicano), *Journal of Law and Economics*, February 2007, 1-44.

- A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition:

    o *Roy Johnson v. Norfolk Southern Railway Company, d/b/a Triple Crown Services Company, and Zurich North America Insurance and Zurich American Insurance Company.* U.S. District Court, Southern District of Illinois, No. 3:14-cv-1095-MJR-WCW. See expert report dated Oct. 9, 2015, filed at Doc. 98-1.

    o *Fernando Ruiz v. XPO Last Mile, Inc. f/k/a Affinity Logistics Corp.,* U.S. District Court, Southern District of California, No. 3:05-cv-02125-JLS-KSC. See expert report dated July 29, 2016, filed at Doc. 320-5.

- A statement of the compensation to be paid for the study and testimony in the case: I am being compensated at my standard rate of $775 per hour for my work on this matter, and have been supported by staff at Charles River Associates, International. Charles River Associates, International is being compensated at standard hourly rates for their staff's work on this matter; I receive a share of these billings.

Dated: ___1/28/17___

Signed: ___[signature]___
Thomas N. Hubbard

EXHIBITS:

1. Curriculum Vitae.
2. *Anderson, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00183-BR, Second Amended Complaint dated July 31, 2015
3. *Artis, et al. v. Murphy-Brown, LLC*, No. 7:14-cv-00237-BR, Second Amended Complaint dated July 31, 2015
4. *Gillis, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00185-BR, Third Amended Complaint dated July 31, 2015
5. *McGowan, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00182-BR, Second Amended Complaint dated July 31, 2015
6. *McKiver, et al. v. Murphy-Brown LLC*, No. 7:14-cv-00180-BR, Second Amended Complaint dated July 31, 2015
7. "Total Surplus" Figure.
8. "Consumer Surplus" Figure.
9. Contract with Kinlaw Farms, MB105401000003-MB105401000022
10. Contracts with other relevant growers.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# RELIANCE LIST

1. *Anderson, et al. v. Murphy-Brown LLC,* No. 7:14-cv-00183-BR, Second Amended Complaint dated July 31, 2015
2. *Artis, et al. v. Murphy-Brown, LLC,* No. 7:14-cv-00237-BR, Second Amended Complaint dated July 31, 2015
3. *Gillis, et al. v. Murphy-Brown LLC,* No. 7:14-cv-00185-BR, Third Amended Complaint dated July 31, 2015
4. *McGowan, et al. v. Murphy-Brown LLC,* No. 7:14-cv-182-BR, Second Amended Complaint dated July 31, 2015
5. *McKiver, et al. v. Murphy-Brown LLC,* No. 7:14-cv-00180-BR, Second Amended Complaint dated July 31, 2015
6. Automated Ventilation Swine Finishing Agreement, Murphy-Brown LLC and Joseph Carter, February 13, 2009, MB104901000015-MB104901000044
7. Market Hog Finishing Agreement, Murphy-Brown, LLC and William Kinlaw, July 7, 2014, MB105401000003-MB105401000022
8. Exemplar Grower agreements for other discovery pool swine CAFOs, including Joey Carter, Bandit 3 LLC, Greenwood Livestock LLC, James Michael Hope, Pagle Corporation, and Godwin Twins, Inc.
9. Murphy-Brown response to request to admissions
10. NC jury instruction for nuisance
11. Smithfield Foods, Inc. websites, http://www.smithfieldfoods.com; http://www.smithfieldfoods.com/our-brands.
12. WH Group websites, http://www.wh-group.com; http://www.wh-group.com/en/about/operations.php; http://www.wh-group.com/en/about/profile.php; http://www.wh-group.com/en/about/leadership.php; http://www.wh-group.com/en/safety/quality.php
13. Shuanghui Development website, http://www.shuanghui.net/
14. Smithfield Annual Reports/Form 10-Ks, 2010-2016
15. Smithfield Foods, Inc.'s Form 10-K for the period ending April 30, 2000
16. WH Group 2015 Annual Report
17. WH Group 2015 Annual Results
18. BusinessWire, "Shauanghui International Changes Name to WH Group," available at http://www.businesswire.com/news/home/20140121005322/en/Shuanghui-International-WH-Group
19. Presentation by Jona Smith, Assistant Director, Information Technology, Smithfield Hog Production Division, available at http://docs.oracle.com/cd/E76387_01/edward/docs/Smithfield_Foods_Migration_Story_May18.pdf

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

20. Statement from Don Butler at the 47th annual NC pork conference available at https://projects.ncsu.edu/project/swine_extension/swinereports/2003/ncporkconf/butler.htm

21. UNC TV "Wendell Murphy: Timeline," available at http://www.unctv.org/content/biocon/wendellmurphy/timeline

22. Mankiw, N. Gregory. *Principles of Economics*. Mason: South-Western Cengage Learning, 2008

23. U.S. International Trade Commission, Pork and Swine, Industry and Trade Summary, October 2014

24. North Carolina Economy at a Glance, US Bureau of Labor Statistics, http://www.bls.gov/eag/eag.nc.htm

25. Deposition of Dean Hilton, November 10, 2016

26. Deposition of Bartolo Myron, September 5, 2016

27. Deposition of Don Butler, November 29, 2016

28. Deposition of Billy Kinlaw, September 9, 2016

29. Kesmodel, David. "Shuanghui to Boost Smithfield Exports as First Priority." *Wall Street Journal*, September 26, 2013, available at http://www.wsj.com/articles/SB10001424052702304795804579099421443260970

30. Butler letter to Pork Council, http://www.ncpork.org/a-letter-from-don-butler-on-the-smithfield-merger/

31. "Inside Information" Announcement, WH Group, August 25, 2016, available at http://file.irasia.com/listco/hk/whgroup/announcement/a160825.pdf

32. Wang, Huifeng, "Analysis of Investment Prospects for Chinese Private Equity Firms in the U.S. Market", June 2015

33. Barboza, David, Chinese Bid for U.S. Pork Had Links to Wall Street, New York Times, June 2, 2013, available at http://www.nytimes.com/2013/06/03/business/global/behind-the-chinese-bid-for-smithfield-foods.html.

34. Kwok, Donny & Maxwell, Kenneth, "Chinese pork supplier WH Group says major investor CDH to sell 10.61 pct stake," Reuters, August 24, 2016, available at, http://www.reuters.com/article/wh-group-cdh-share-sale-idUSL3N1B60TU

35. Dongmei, Li, CDH Investment Seeks $1.2B Partial Exist from WH Group, August 25, 2016, available at https://www.chinamoneynetwork.com/2016/08/25/cdh-investments-seeks-916m-partial-exit-from-wh-group

36. Paul Hastings, CDH Investments Sells US$900 Million Stake in WH Group, August 25, 2016, available at https://www.paulhastings.com/news/details/?id=202eea69-2334-6428-811c-ff00004cbded.

37. "The Prize in Economic Sciences 2016 - Press Release". Nobelprize.org. Nobel Media AB 2014. Web. 5 Dec 2016. Available at http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2016/press.html

38. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-73 (1984).

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

39. Jensen, Michael C. and William H. Meckling. "Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure." *Journal of Financial Economics,* Vol. 3 (1976): 305-360

40. Baker, George P. and Thomas N. Hubbard. "Contractibility and Asset Ownership: On-Board Computers and Governance in U.S. Trucking." *Quarterly Journal of Economics*, Vol. 119, Iss. 4, 2004, pp. 1443-1479

41. Ramirez and Zaabel, Swine Biological Risk Management, Center for Food Security and Public Health, March 2012, available at http://www.cfsph.iastate.edu/pdf/swine-biological-risk-management/

42. Robbins, William. "Farmers Turn to Hog Raising for a Fee". *The New York Times*. May 29, 1988, available at http://www.nytimes.com/1988/05/29/us/farmers-turn-to-hog-raising-for-a-fee.html

43. Leonard, Christopher. *The Meat Racket: The Secret Takeover of America's Food Business*. Simon & Schuster, February 2014

44. Nowlin, Michelle B., "Sustainable Production of Swine: Putting Lipstick on a Pig?" *Vermont Law Review*, Vol. 37, 2013, pp. 1079-1141, available at http://scholarship.law.duke.edu/faculty_scholarship/3111/

45. "WH Group Global Offering," WH Group, April 15, 2014, available at: http://www.wh-group.com/en/ir/announcements/a140415a.pdf

46. Video"Inside the Smithfield Plant" at https://www.youtube.com/watch?v=1s8Vt-Q8N80

47. Weigl, Andrea, "Gone to Market," *The Raleigh News & Observer*, August 13, 2008.

48. Environmental Fabrics, Inc. press release at http://www.environmentalfabrics.com/docs/Kenansville%20Farms.pdf

49. Schiffman, S.S., Williams, C., 2005. Science of odor as a potential health issue. Journal of Environmental Quality 34, 129-38. Available online at https://static1.squarespace.com/static/54806478e4b0dc44e1698e88/t/55e0c69fe4b09852462992d9/1440794271771/SchiffmanOdorsJEQJan05.pdf

50. "Total Surplus" Figure

51. "Consumer Surplus" Figure

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER