UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:14-CV-00183-BR

| | |
|---|---|
| **EUNICE ANDERSON, *et al.*,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **MURPHY-BROWN, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

# PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR DISCOVERY SANCTIONS BASED ON SPOLIATION AND LATE-RECEIVED EVIDENCE AND TO RE-OPEN DISCOVERY

## I. Introduction

This motion involves pressing discovery matters relating to the *Anderson* cases and the Crooked Run facility. Fortunately, based on previous events in this litigation, the Court has had the foresight to implement a procedure with which to address them.[1]

A mere six days ago, Plaintiffs received for the first time the following 2017 letter written by the Crooked Run owner to NC DENR:

> [A]s I'm sure you [NC DENR] and your staff are aware, Crooked Run Farm is currently in the Smithfield Foods lawsuit. I was advised by attorneys, representing my farm in these lawsuits, it would be a good idea not to irrigate during times of scheduled assessments and studies on [Crooked Run]. This period of scheduled farm visits and assessments . . . began around September 2016 through the end of 2016.
>
> -- March 26, 2017 Correspondence from Matt Butler, then-owner of Crooked Run,[2] to NC DENR (explaining that Crooked Run's lagoon level had exceeded the maximum regulatory level as of February 16, 2017, because Butler had been advised by lawyers not to spray hog waste from Crooked Run's lagoon during

[1] *See* **Exhibit 1**, Transcr. of June 27, 2018 Hearing on "Motion Filed by Plaintiffs for Discovery and Further Relief Pertaining to Late Produced Documents" at 31:9-15 (THE COURT: "I must say that *throughout the remainder of these cases*, that I intend to have a magistrate judge available to handle all discovery disputes at the time that they occur . . . ." (emphasis added)).
[2] As discussed further *infra*, Crooked Run's ownership status is unclear at best.

> Defendant's odor studies and Plaintiffs' site inspections between September-December 2016).[3]

The Crooked Run operation—the subject of the *Anderson* case and trials—is arguably the most poorly managed operation in the Discovery Pool cases. Crooked Run is a contract grower operation owned by a Smithfield employee who was specifically approved for ownership by Smithfield then-CEO Larry Pope. At relevant times Crooked Run was also managed by other Smithfield employees and has received a number of citations by NC DENR.

Smithfield's corporate trial representative Kraig Westerbeek helped the Smithfield-employee owner write letters to NC DENR to try to prevent the operation from receiving Notices of Violation ("NOVs") for poor management.[4] Shortly after Crooked Run was selected as a Discovery Pool case, and while Plaintiffs were seeking site inspections in order to photographically and scientifically document nuisance-producing conditions, Defendant systematically depopulated Crooked Run. Defendant did so without providing Plaintiffs any notice or taking any efforts to preserve or document the conditions.

What's more, Defendant's attorneys—either those representing Smithfield or those hired by Smithfield to represent the growers—told the Crooked Run growers to engage in behavior that would alter evidence for trial. Defendant's attorneys told the Crooked Run growers not spray waste so as to alter the results of the odor monitoring that Defendant was conducting and of the site inspections that Plaintiffs were going to conduct. Defendant's attorneys wanted to affect both the Defendant's and Plaintiffs' expert investigations in a way favorable to Smithfield.

The above-quoted letter to NC DENR—received by Plaintiffs for the first time on the eve of the pretrial disclosures deadline in *Anderson*—is but the latest link in a chain of concerted spoliation efforts

---

[3] *See* **Exhibit 2**, letter from Matt Butler, owner of Crooked Run, to NC DEQ. Plaintiffs received this correspondence for the first time on the eve of the pretrial disclosures in this case. *See* **Exhibit 3**, correspondence between Plaintiffs' counsel and DEQ. Notably, Plaintiffs received this correspondence as a result of a request to NC DENR, not Defendant or counsel for the growers.

[4] "Murphy-Brown, upon request from the independent grower at Crooked Run Farm, provided advice in responding to certain communications sent [from NC DENR] to [Crooked Run] and also suggested the implementation of remedial measures as necessary." *See* **Exhibit 4**, Fourth Amended Defendant Fact Sheet No. 59 (Jan. 21, 2019)

involving Defendant and the owners of Crooked Run. The record reflects that despite Crooked Run's historically poor management—documented by numerous notices of regulatory violations involving non-compliant lagoon levels, plugged pits, failures to timely dispose of swine carcasses and bones, and frequent rat infestations—Defendant continued to place hogs at Crooked Run in violation of Defendant's own internal policies. Only after Crooked Run was chosen as a Discovery Pool case and after Plaintiffs' site inspection of the facility became imminent did Defendant depopulate it, and without preserving any evidence of the conditions at the historically-populated Crooked Run.

The evidence demonstrates that Defendant depopulated Crooked Run without taking any steps to preserve any evidence whatsoever of its populated state, and without notice to Plaintiffs of Defendant's intent to completely depopulate the facility in advance of the court-ordered site-inspection. The facts further reflect that Defendant took steps to perpetuate the ostensible reason for depopulating Crooked Run—chronic noncompliant lagoon levels—through the end of Plaintiffs' December 2016 site inspections. As referenced above, attorneys encouraged the Crooked Farm grower *not* to spray effluent—which would have lowered the lagoon level—during the period of Plaintiffs' site inspections, *i.e.*, "beg[inning] around September 2016 through the end of 2016." *See* **Ex. 2**.

Recent events have underscored Defendant's spoliation of evidence of Crooked Farm in its populated state. In addition to learning on the eve of the pretrial disclosures deadline that the Crooked Run grower was told "it would not be a good idea to irrigate during times of scheduled assessments and studies," Defendant also advised Plaintiffs for the first time on January 21, 2019, that some change of Crooked Run ownership occurred in July 2017. Namely, Smithfield now has an ownership or security interest in the operation. *See* **Ex. 4** at 27**.** Therefore, in addition to spoliation relief, Plaintiffs are entitled to reopen discovery to explore the circumstances surrounding: (1) Crooked Run's depopulation, (2) the grower being "advised" not to spray effluent during Plaintiffs' site inspections, and (3) the events leading to the execution of the documents described in Defendant's late disclosures as relating to Crooked Farm ownership.

## II.
## Factual Background

### A. The Crooked Run grower confirms the facility's history of poor management, Defendant's decision to depopulate the facility due to excessive lagoon levels, and the imminent return of Crooked Run to its previously populated state.

On November 8, 2016, in preparation for court-ordered site inspections of Defendant's hog operations, Plaintiffs deposed Matt Butler, one of the then-owners of Crooked Run.[5] During his deposition, Butler confirmed that Defendant controlled how many hogs Crooked Run would receive and how long those hogs would remain.[6] Butler also verified that as of the time of his November 2016 deposition, Crooked Run had been in serious violation of the regulatory maximum lagoon level for over six weeks.[7]

Butler further testified that during his approximate five-year tenure[8] as an owner of Crooked Run, roughly 30 hogs had been killed by electrocution[9] and that Crooked Run had been audited at least 21 times with an average score of 77—which is "far below expectations" according to Smithfield.[10] The record demonstrates that Crooked Run—and Defendant—had been notified of numerous regulatory violations, including repeated woefully non-compliant freeboard, plugged pits, failure to remove swine carcasses and bones, rat infestations, and huge amounts of rat feces.[11]

Butler confirmed that there had been a brief period of time in which Defendant had not sent hogs to Crooked Run because of maintenance and freeboard issues.[12] Butler also testified that hog manure from Crooked Run had run off into ditches near the facility, and that the State of North Carolina had cited

---

[5] *See* **Exhibit 5,** Matt Butler deposition, November 8, 2016, at p. 49:1-6.
[6] **Ex. 5** at 14:10-15.
[7] **Ex. 5** at 41:12-15.
[8] *See* **Exhibit 6,** Robbie Montgomery deposition, November 8, 2016, at pp. 38:16-39:8.
[9] *See* **Ex. 5** at p. 68:7-11.
[10] *See* **Exhibit 7,** December 2, 2014 audit by Defendant of Crooked Run.
[11] *See* **Exhibit 8**, Defendant's list of repairs needed at Crooked Run; Email from Robbie Montgomery documenting problems at Crooked Run; October 18, 2013 audit by Defendant of Crooked Run; March 27, 2014 Notice of Violation; and February 16, 2017 Notice of Violation.
[12] *See* **Ex. 5** at pp. 77:21-78:1. *See also* **Exhibit 9,** Crooked Run numbers, MB232000035 (Dec. 13, 2015-April 24, 2016).

Crooked Run for that clear regulatory infraction.[13] Importantly, Butler testified that as of the date of his deposition, Defendant had completely depopulated Crooked Run.[14]

However, Butler did not indicate that Defendant's depopulation of Crooked Run was expected to continue for any significant period of time. To the contrary, Butler testified that Crooked Run had been scheduled to be repopulated by Defendant on or around November 2, 2016, but that Defendant had not gone forward "with the lagoon the way it was."[15] Butler indicated that in order for Defendant to repopulate Crooked Run, Butler merely needed to "do a few things to the houses."[16]

Butler expressly represented that he himself was "in charge of figuring out when it is that [he]'ll be able to get [his] hogs next," and that "once [he] get[s] 24 inches [of freeboard] and do[es] a little bit of welding in the houses," Defendant would repopulate Crooked Run.[17] Butler's testimony was bolstered by then-Crooked Run co-owner and Smithfield employee Robbie Montgomery, who testified in his deposition earlier that same day that Crooked Run was "supposed to [have been repopulated] maybe a couple weeks ago."[18] Importantly, Defendant's counsel was present for both Butler's and Montgomery's depositions and did not correct the misimpression created by their testimony that Defendant would indeed repopulate Crooked Run in the near future.[19]

### B. Defendant heavily negotiates a December 2016 date for Plaintiffs' inspection of Crooked Run while withholding Defendant's active coordination of depopulating the facility in advance of Plaintiffs' scheduled inspection.

It was in the context of Crooked Run's historically poor management that Defendant and Crooked Run's owners received Plaintiffs' June 3, 2016 subpoena. The subpoena requested, *inter alia*,

- "Documents reflecting *any steps* taken at [Crooked Run] to control or reduce odor, air or water emissions or pollution from hog sheds, waste lagoons, land application fields, or the trucks going to or from [Crooked Run]"; and

---

[13] *See* **Ex. 5** at pp. 112:24-113:7.
[14] *See* **Ex. 5** at p. 105:17-18.
[15] *See* **Ex. 5** at p. 106:6-8.
[16] *See* **Ex. 5** at p. 106:9.
[17] *See* **Ex. 5** at p. 107:13-17.
[18] *See* **Ex. 6** at p. 117:19-22.
[19] *See* **Ex. 5** at p. 4:16-17 ("MR. SNUKALS: Dixon Snukals with McGuire Woods on behalf of Murphy-Brown, LLC."); *See also* **Ex. 6** at p. 2:11-15; p. 4:16-17 ("MR. SNUKALS: Dixon Snukals with McGuire Woods on behalf of Murphy-Brown, LLC.").

- "Any *photos or video* of the inside of the hog sheds, of the lagoons, or of any of the land application fields or of land application occurring on those fields, *at any time*."[20]

Then, between August 8 and September 28, 2016, Plaintiffs and Defendant engaged in extensive meet-and-confers regarding Plaintiffs' site inspections of discovery pool facilities, including Crooked Run specifically.[21] As of September 14, 2016, Defendant had advised that Paul Stanley No. 7 and Willow Creek had been depopulated in September 2015 and January 2016,[22] respectively. Defendant provided no notice to Plaintiffs during those exchanges that Defendant had begun systematically removing hogs from Crooked Run in July 2016 and apparently determined that as of September 25, 2016, Crooked Run would be depopulated[23]—as it now appears—until the termination of the litigation. Defendant's glaring omission is particularly troublesome in light of the fact that in September 2, 2016 correspondence to Defendant, Plaintiffs referred to Crooked Run as one of "[t]he 7 *active* sites out of the 9."[24] Defendant neglected to clarify that in the preceding weeks it had reduced the population at Crooked Run from 4047 to 1549 in the run-up to total depopulation by September 25, 2016.[25]

As of September 28, 2016, Defendant had advised Plaintiffs that their site inspections of grower-owned facilities—including Crooked Run—would remain on hold indefinitely pending finalization "by agreement or otherwise" of the inspection protocols for the Defendant-owned facilities.[26] Because of the lack of progress in scheduling site inspections by agreement, on October 2, 2016, Plaintiffs filed a motion to compel site visits, including Crooked Run.[27] Plaintiffs' motion demonstrates that while they were aware

---

[20] Doc. 179-4 at 12, nos. 30, 31 (5:15-cv-00013-BR) (emphasis added).
[21] Doc. 179-13 (5:15-cv-00013-BR).
[22] Plaintiffs reserve all rights as to Defendant's depopulation of Paul Stanley No. 7 and Willow Creek without notice to Plaintiffs and without taking adequate measures to preserve evidence of those facilities in their populated states.
[23] Doc. 179-13 at 29-30 (5:15-cv-00013-BR).
[24] Doc. 179-14 at 8 (5:15-cv-00013-BR) (emphasis added).
[25] *See* **Ex. 9,** Crooked Run numbers.
[26] Doc. 179-13 at 37 (5:15-cv-00013-BR).
[27] Doc. 179 at 2 (5:15-cv-00013-BR).

that Defendant had depopulated Willow Creek and Paul Stanley No. 7, *Plaintiffs were still unaware that Defendant had also depopulated Crooked Run*.[28]

On October 19, 2016, the Court ordered that Plaintiffs were entitled to conduct site inspections at nine facilities, including Crooked Run, and that as part of those inspections Plaintiffs would be permitted to "inspect, measure, photograph, and videotape" the facilities' infrastructure and conditions.[29] The Court's order further specifically noted that two facilities—Willow Creek and Paul Stanley—had been depopulated, and thus inspections of those sites could be conducted "on the same day after another site visit because of reduced biosecurity concern."[30] Unbeknownst to Plaintiffs or the Court, over three weeks earlier Defendant had also depopulated Crooked Run.[31]

In the lead-up to[32] and immediately following the Court's order, Plaintiffs again initiated numerous meet-and-confers regarding site inspection scheduling. Despite the Court's order, Defendant continued its delay tactics.[33] Defendant subsequently tentatively agreed to site inspection dates, including "after December 14[, 2016]" for Crooked Run, which Defendant then advised for the first time "is depopulated."[34] Defendant ultimately agreed for Plaintiffs "to do the visit of Crooked Run on either Thursday, December 15 or Friday, December 16[, 2016]."[35]

---

[28] Doc. 179 at 2 (5:15-cv-00013-BR) ("Seven [hog confinements] are actively growing hogs: Sholar, Kinlaw, Joey Carter, Greenwood 1 & 2, M&D and Crooked Run. Two have shut down: Willow Creek and Paul Stanley 7.").
[29] Doc. 214 at 2-3 (5:15-cv-00013-BR).
[30] Doc. 214 at 3 (5:15-cv-00013-BR).
[31] *See* **Exhibit 10**, Oct. 26, 2016 email between JH and Henneke re: "site visits" (discussing scheduling site inspection of Crook Run "[e]ven though Crooked Run is depopulated").
[32] *See* **Ex. 10**, Oct. 18, 2016 email from J. Hughes to Tennille Checkovich at 5:32 pm ("on the assumption we get the court's order on site visits in the next day or two, let's try to set dates again").
[33] *See* **Ex. 10**, Oct. 25, 2016 email from J. Hughes to Henneke at 2:11 am ("I am growing concerned because I have not yet seen indication of agreement by defendant or growers as to the dates in Nov and Dec we proposed. The court's order was dated 10/19 – 6 days ago.").
[34] *See* **Ex. 10**, Oct. 26, 2016 email from Henneke to J. Hughes at 9:42 p.m.
[35] *See* **Ex. 10**, Oct. 28, 2016 email from Henneke to J. Hughes at 4:59 p.m.

On November 8, 2016, Defendant finalized the scheduling for a site inspection of Crooked Run on December 15, 2016.[36] As the Court will recall from previous briefing in the *McKiver* and *McGowan* cases,[37] the last two days of Plaintiffs' site inspections were scheduled for December 14 and 15, 2016, when Plaintiffs' team was to inspect the Sholar and Greenwood No. 2 facilities.[38] Plaintiffs further intended to briefly inspect Crooked Run on December 15 following the Sholar and Greenwood No. 2 inspections in accordance with the Court's order contemplating inspections of depopulated sites "on the same day after another site visit because of reduced biosecurity concern."[39]

However, as discussed in further detail in the *McKiver* and *McGowan* cases, when Plaintiffs' team arrived at Sholar on December 14, they were informed by Defendant for the first time that the hogs at Sholar had allegedly developed porcine epidemic diarrhea ("PED"). Defendant advised Plaintiffs that if they were to go forward with the inspection of Sholar as scheduled, Plaintiffs would be prohibited from inspecting any other operations for "biosecurity reasons," *i.e.*, prohibited from inspecting Greenwood No. 2 before the expert report deadline.[40] The only way to salvage the schedule was for Plaintiffs to switch to Greenwood No. 2 for December 14 and postpone the Sholar inspection to December 15.

Defendant then took almost two hours to agree to move the inspection to Greenwood No. 2 that day, which obviously reduced the available inspection time.[41] And after Plaintiffs' team traveled to Greenwood No. 2, they waited another *two hours* before Defendant provided access to the facility. During the interim, Plaintiffs observed a pumper truck leaving Greenwood No. 2 after spraying down the hog buildings in what could only be interpreted as an attempt to skew Plaintiffs' inspection and testing.[42] When

---

[36] *See* **Ex. 10**, Nov. 8, 2016 email from J. Hughes to Henneke at 5:40pm.
[37] *See* **Exhibit 11**, Rogers declaration at 71 and 73. *See also* **Exhibit 12**, Rogers' July 13, 2018 trial testimony. *See also* **Exhibit 13**, Excerpt of Rogers report.
[38] Doc. 97-12 at ¶ 68 (7:14-cv-00182-BR).
[39] Doc. 214 at 3 (5:15-cv-00013-BR).
[40] Doc. 97-12 ¶ 71 (7:14-cv-00182-BR).
[41] *Id*. at ¶ 74.
[42] *See* **Ex. 12**.

Plaintiffs were finally granted access, Defendant gave them only *four hours* to conduct more than *eight hours*' worth of inspection and testing.[43]

The next day, December 15, 2016, Plaintiffs inspected Sholar. Because Plaintiffs had used the Sholar-labeled containers the day before at Greenwood No. 2 because of the last-minute scheduling change, Plaintiffs used Crooked Run-labeled containers for Sholar and ultimately were unable to inspect Crooked Run due to the time constraints placed upon them by Defendant for the Greenwood No. 2 and Sholar inspections.[44] Under those circumstances, Plaintiffs did not at the time insist on immediately rescheduling an inspection of Crooked Run. In fact, given that Defendant had depopulated it, an inspection at that time would not have provided sampling or photography accurately reflecting the nuisance-producing conditions.

Instead, based on Butler's and Montgomery's testimony that Defendant's repopulation of Crooked Run was all but imminent upon completion of a handful of routine maintenance items, Plaintiffs deferred teeing up an inspection of Crooked Run until such time as the nuisance conditions could be accurately documented. However, Defendant has chosen not to repopulate Crooked Run, rendering such documentation impossible. Little could Plaintiffs have known in December 2016 that contrary to Butler's and Montgomery's testimonies—for which Defendant: (1) was present, and (2) made no effort to equivocate or caveat—over two years later Crooked Run would remain totally depopulated and even further non-representative of the conditions experienced by Plaintiffs during the nuisance damages period. Defendant's subsequent decision not to repopulate Crooked Run—after creating the impression for Plaintiffs that it would—has further amplified Defendant's discovery misconduct in its depopulation of Crooked Run in September 2016 that will be discussed further *infra*. In short, Defendant—in concert with Crooked Run—failed to: (1) preserve evidence of Crooked Run's conditions and operations in its populated state, or (2) provide advance notice to Plaintiffs of Crooked Run's depopulation and opportunity for Plaintiffs to inspect and preserve evidence of Crooked Run in the populated state in which it existed during the preceding six-plus years of Plaintiffs' damages period.

---

[43] Doc. 97-12 at ¶ 76 (7:14-cv-00182-BR).
[44] Doc. 97-12 at ¶ 80 (7:14-cv-00182-BR).

### C. The Crooked Run grower blames the facility's February 2017 excessive lagoon level on instructions "by attorneys" not to spray hog waste—which would have lowered the lagoon level—between September and December 2016 because of Plaintiffs' site inspections scheduled during that time period.

Unfortunately, as reflected in the excerpts directly preceding the Introduction above, Plaintiffs have discovered in the last several days that Defendant's discovery abuse *vis-à-vis* Crooked Run did not stop with its: (1) failure to preserve evidence of Crooked Run's conditions in its populated state, (2) failure to provide advance notice of depopulation, or (3) misrepresentation that Crooked Run would be repopulated and subject to future inspection in that condition. The evidence reflects that on March 26, 2017, Butler sent correspondence to the NC DENR/DWR with the subject heading "***NOV with Recommendation for Enforcement:*** Crooked Run Farm."[45] In that correspondence, Butler responded to a NC DENR "Notice of Violation with Recommendation for Enforcement received by [Crooked Run] on February 16th, 2017" for "[f]ailure to maintain the waste level in lagoon to not exceed the maximum level."[46] Butler explained that Crooked Run's February 2017 lagoon level violation was due in part to "advi[ce] by attorneys, representing my farm in [the Smithfield Foods lawsuit]" that "*it would be a good idea not to irrigate during times of scheduled assessments and studies on the farm*,"[47] which according to Butler "began around September 2016 through the end of 2016."[48]

This correspondence implicates several issues, including:

1. To explain Crooked Run's undisputed February 2017 lagoon level violation, Butler is relying on advice of counsel (retained and paid for by Defendant[49]) *not* to spray—and thus violate applicable lagoon level regulations—as part of *Defendant*'s broader litigation strategy;

2. Butler is representing to a regulatory agency that he was advised by attorneys (hired by Defendant) not to spray between September and December 2016 while Defendant was conducting "odor monitoring" and Plaintiffs were performing site inspections, thereby evidencing a broader strategy by Defendant to alter the normally-present conditions at its facilities to create an artificial environment during sampling and site inspections[50];

---

[45] *See* **Ex.** 2 (emphasis original).
[46] Id.
[47] Id. (emphasis added).
[48] Id.
[49] *See* **Exhibit 14**, Paul Stanley deposition, August 26, 2016 at pp. 126-127.
[50] For evidence that waste spraying creates additional odor, *See* **Exhibit 15,** *Artis* Plaintiffs' trial exhibit 1116.

3. Butler clearly expects his excuse that properly irrigating at Crooked Farm would negatively impact the Swine Farm Nuisance Litigation to be a compelling excuse to North Carolina State Regulators for maintaining lagoon levels in excess of the maximum allowed; and

4. Crooked Run received this February 2017 lagoon level violation after Defendant had completely depopulated it in September 2016—*i.e.*, when Crooked Run's lagoons exceeded the maximum level in February 2017, Crooked Run had housed *no* hogs for the previous *five months*.[51]

This correspondence is further notable in light of Butler's deposition testimony in November 2016—during the period Butler later referenced as during Plaintiffs' "scheduled farm visits"—that while he had no "problems at Crooked Run with having places to put the waste,"[52] he nevertheless had "not had a chance to get to Crooked Run" but would be "getting to it" and was "just taking a little time."[53]

Notably for purposes of the instant motion, Plaintiffs received a copy of this correspondence for the first time ***on January 22, 2019***—not from Butler, Smithfield employee and co-owner Montgomery, Butler's attorney (Bo Thompson), or Defendant, *but from NC DENR*.[54] In fact, both Thompson and Smithfield refused to supplement discovery relating to correspondence with state agencies.[55]

In preparation for the pretrial disclosures for the first *Anderson* trial, Plaintiffs—as they routinely do prior to pretrial disclosures—requested an update of the records in the Crooked Run NC DENR file. The NC DENR production obtained by Plaintiffs on January 22, 2019, reflects that Thompson requested the DENR file containing Butler's March 26, 2017 correspondence almost a year ago but has never produced it to Plaintiffs.[56] The gravity of this discovery is particularly troublesome in light of the fact that Defendant likely assisted Butler in preparing this correspondence as part of its admitted practice of

---

[51] *See* **Ex. 9**, Crooked Run Numbers. Defendant has judicially admitted that Crooked Run "was depopulated by October 2, 2016." **Ex. 4,** Fourth Amended DFS at 2; *see also* Nos. 31 (Defendant "removed the last of its swine [from Crooked Run] by October 2016."); 37 (responding that "swine have not been produced at Crooked Run Farm since October 2016").
[52] *See* **Ex. 5,** Butler depo at p. 43:10-14.
[53] *See* **Ex. 5,** Butler depo at 114:16-21.
[54] *See* **Ex. 3,** Correspondence between Ps counsel and DEQ.
[55] *See* **Exhibit 16**, letter from Plaintiffs to Defendant requesting supplement; *See also* **Exhibit 17**, letter from Plaintiffs to grower counsel requesting supplement; *See also* **Exhibit 18**, letter from Defendant to Plaintiffs denying supplement; *See also* **Exhibit 19**, letter from grower counsel to Plaintiffs denying supplement.
[56] *See* **Exhibit 20,** Feb. 13, 2018 "File Access Record" from Yates, McLamb and Wegher LLP to DWR.

"provid[ing] advice in responding to certain communications sent to [Crooked Run]," with such "communications" including "NC DENR . . . agency inspections, investigations, citations, or penalties regarding [Crook Run]."[57]

### D. On January 21, 2019, Defendant discloses for the first time a July 2017 transaction implicating Crooked Run's ownership.

To compound matters, on January 21, 2019—the day before pretrial disclosures were due—Defendant advised Plaintiffs for the first time that *18 months ago* on July 28, 2017, Defendant "pa[id] off the mortgage on the Crooked Run Farm" in "exchange for" a "Deed of Trust, Promissory Note, Unconditional Guarantee and Security Agreement."[58] Even more confusingly, Defendant simultaneously denied that it has "ever directly owned [Crooked Run] in whole or in part."[59] Plaintiffs are thus at a loss as to whether Crooked Run is a grower- or company-owned facility, particularly in light of Defendant's and Thompson's silence on this issue for the last year-and-a-half, which has effectively precluded Plaintiffs from propounding discovery on the issue.

## III.
## Argument & Authorities

### A. Plaintiffs are entitled to offer photos and other evidence depicting conditions at other populated hog sites or a jury instruction permitting the jury to infer that the destroyed evidence of Crooked Run its populated state would have been adverse to Defendant.

Defendant's depopulation of Crooked Run in the months leading up to Plaintiffs' pre-scheduled site inspections—while curiously timed—is not the crux of the instant motion. The issue is that Defendant depopulated Crooked Run:

1. without preserving evidence of Crooked Run's conditions in its populated state;
2. without notice to Plaintiffs;
3. without providing Plaintiffs with the opportunity to inspect and document the conditions of Crooked Run in its populated state or otherwise take reasonable steps to preserve or document those conditions; and

---

[57] *See* **Ex. 4**, Fourth Amended DFS No. 59.
[58] *See* **Ex. 4**, Fourth Amended DFS No. 27.
[59] *See* **Ex. 4**, Fourth Amended DFS No. 17. Defendant's response to No. 37 is woefully insufficient, particularly in light of Plaintiffs' specific request that Defendant "please describe" its response.

4. while inducing Plaintiffs to rely on the misimpression that they would be able to perform a site inspection of Crooked Run in its populated state in advance of trial in the cases involving Crooked Run.

As a threshold matter, federal spoliation law applies. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[F]ederal law of spoliation applies because, as we note below, the power to sanction for spoliation derives from the inherent power of the court, not substantive law."). Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process). The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process to retain confidence that the process works to uncover the truth. *Silvestri*, 271 F.3d at 590.

A district court has broad discretion in choosing an appropriate sanction for spoliation, and "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779. In addition, a court must find some degree of fault to impose sanctions. *Silvestri*, 271 F.3d at 590. When imposing sanctions, "the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

In the Fourth Circuit, "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri*, 271 F.3d at 591 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)). If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence. *See id.*

Here, even if Defendant did not technically own Crooked Run in the months leading to its depopulation in September 2016, the record reflects that Defendant owned the hogs and did control the operation in a legal sense. As Butler testified, Defendant decided "how may pigs [Crooked Run] gets" and "how long the pigs stay [at Crooked Run]."[60] Moreover, Defendant clearly had access to Crooked Run in that Defendant was given unlimited access to the operation for inspection purposes.[61]

Moreover, the evidence demonstrates that Crooked Run remained in its populated condition ***for years*** during a period in which Defendant and its attorneys recognized not only that Plaintiffs would be suing Defendant based on the nuisance-causing conditions at Crooked Run, but also that Plaintiffs should be given an opportunity to inspect the Crooked Run Operation. On July 3, 2013, Plaintiffs submitted a Request for Prelitigation Mediation of Farm Nuisance Dispute specifically direct to Crooked Run.[62] And on September 5, 2013, Plaintiffs filed their civil complaint directed to operations at Crooked Run.[63] Between July and September 2013, Defendant maintained between 5000-8000 hogs at Crooked Run.[64]

A party's destruction of evidence is considered "willful" if the party "has some notice that the [evidence was] potentially relevant to the litigation before [it was] destroyed." *Leon v. IDX Sys. Corp*., 464 F.3d 951, 959 (9th Cir. 2006). Because the relevance of destroyed evidence cannot clearly be ascertained, a party "can hardly assert any presumption of irrelevance" as to the destroyed evidence. *Id.* (quoting *Alexander v. Nat'l Farmers Org*., 687 F.2d 1173, 1205 (8th Cir. 1982)). From July 2013 at the latest, Defendant, its attorneys, and its expert witnesses were fully aware that Crooked Run in its populated condition was material evidence in this litigation. Yet, they failed to take any steps to ensure that Defendant discharged its duty to prevent the spoliation of that evidence.

Plaintiffs emphasize that spoliation is not only the destruction or significant alteration of evidence, but also "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable

[60] *See* **Ex. 5**, Butler depo at 14:10-15.
[61] *See* **Exhibit 21**, Contract between Defendant and Robbie Montgomery at p. 6 (Bates -80).
[62] *See* **Exhibit 22**, Prelitigation mediation request.
[63] *See* **Exhibit 23**, Wake County complaint
[64] *See* **Ex. 9**, MB232000035 (Crooked Run Numbers).

litigation." *Graff v. Baja Marine Corp*., 310 Fed.Appx. 298, 301 (11th Cir. 2009). Accordingly, parties to a dispute may also be subject to an obligation to preserve evidence for purposes of litigation. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp*., 247 F.3d 423, 436 (2d Cir. 2001). Here, Crooked Run's conditions in a populated state are the primary subject-matter of the litigation, and are therefore clearly relevant. *See Elhannon LLC v. F.A. Bartlett Tree Expert Co*., No. 2:14-CV-262, 2017 WL 3309692, at *3 (D. Vt. Aug. 2, 2017) ("In this case, the damage to the trees is the primary subject-matter of the litigation, and is therefore clearly relevant."). Moreover, the duty to preserve the physical evidence attached, at latest, on September 5, 2013, when Plaintiffs filed their civil complaint directed to operations at Crooked Run. *See id*. ("Moreover, the duty to preserve the physical evidence attached, at latest, on December 10, 2014, when Elhannon filed its first complaint in this case."). It is undisputed that Defendant depopulated Crooked Run after this point without preserving any evidence of the populated conditions and has perpetuated that depopulated state ever since.

Moreover, Plaintiffs have been prejudiced by Defendant's depopulation of Crooked Run. Prejudice is shown when the destroyed evidence goes to a critical issue and the evidence at hand is conflicting. *U.S. ex rel. Baker v. Cmty. Health Sys., Inc*., No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *14 (D.N.M. Aug. 31, 2012), *objections overruled*, No. CIV. 05-279 WJ/ACT, 2012 WL 5387069 (D.N.M. Oct. 3, 2012). Destruction that precludes a party from inspecting physical evidence can create prejudice. *Unigard*, 982 F.2d at 369.[65] However, the existence of secondary evidence can reduce prejudice caused by the inadvertent loss of primary evidence. *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc*., 306 F.3d 806, 825 (9th Cir. 2002) (digital images of misplaced slides and records retained by lab and doctors examining those slides constitute secondary evidence).

---

[65] Similarly, forcing a party to rely on evidence selected by an opposing party's expert creates prejudice because such evidence generally supports that party's case. *BTO Logging, Inc. v. Deere & Co*., 174 F.R.D. 690, 694 (D.Or. 1997).

Here, the relevance of conditions at a populated Crooked Run is undisputed. It is self-evident that those conditions which Defendant failed to document or preserve and has destroyed are relevant, since Plaintiffs seek damages for the loss of use and enjoyment of their properties as a result of the nuisance caused by those conditions. Accordingly, Defendant's September 2016 destruction of those conditions—without taking reasonable steps to document or preserve them, including advance notice to Plaintiffs—was willful, since litigation was reasonably foreseeable in 2013 when Plaintiffs sent their pre-suit requests for mediation and filed their complaint.

Plaintiffs anticipate that Defendant may contend that depopulating Crooked Run was a reasonable measure necessary to mitigate additional damages. However, courts have declined to enter spoliation sanctions under such circumstances only where, for example, "removal of that evidence was necessary to avoid accruing damages of roughly a million dollars per day and the non-moving party took '*all reasonable steps to preserve evidence*' by documenting the physical evidence with photographs and notes and saving fragments of the removed evidence." *See Elhannon LLC v. F.A. Bartlett Tree Expert Co*., No. 2:14-CV-262, 2017 WL 3309692, at *3 (D. Vt. Aug. 2, 2017, emphasis added) (discussing *Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc*., Case No. 04–4699 JRT/FLN, 2006 WL 2472819, at *5 (D. Minn. Aug. 25, 2006)). In contrast, other district courts have found that spoliation sanctions may be required where the failure to preserve evidence in its original state "was not urgently required" or necessary for purposes of mitigation. *See, e.g., PacifiCorp v. Nw. Pipeline GP*, 879 F. Supp. 2d 1171, 1192–94 (D. Or. 2012). Here, the record reflects no evidence that total depopulation of Crooked Run was "urgently required" on September 25, 2016, or otherwise "necessary for purposes of mitigation." To the contrary, Defendant had previously continued to populate Crooked Run despite its numerous regulatory infractions.

Regardless, Defendant never documented the nuisance conditions. Nor did Defendant notify Plaintiffs that it was in the process of depopulating Crooked Run during the site inspection negotiations. Defendant also failed to offer Plaintiffs an opportunity to inspect Crooked Run before Defendant significantly altered—apparently at least for the duration of the cases involving Crooked Run—conditions at Crooked Run in its populated state. *See PacifiCorp v. Nw. Pipeline GP*, 879 F. Supp. 2d 1171, 1192–93

(D. Or. 2012) ("PacifiCorp never notified GTN that it planned to refurbish the nozzles or offered to let GTN inspect the nozzles before they were irrevocably altered. Indeed, PacifiCorp, as the party in control of evidence relevant to anticipated litigation, had the obligation to notify GTN of that evidence and provide access before destroying it." (citations omitted)); *see also Erlandson v. Ford Motor Co*., No. 08–CV–1137–BR, 2009 WL 3672898, at *5 (D. Or. Oct. 30, 2009) ("The party in control of the evidence has 'an obligation to give the opposing party notice of access to the evidence ... if the party anticipates litigation involving that evidence.'") (quoting *Silvestri*, 271 F.3d at 591).

Because the conditions present at a populated Crooked Run are at the heart of this case, and no physical evidence apparently[66] remains of those conditions, Plaintiffs request sanctions as to the evidence Plaintiffs may introduce in support of their nuisance claims commensurate with Defendant's spoliation. In light of Defendant's destruction of evidence of Crooked Run in its populated state, Plaintiffs request that they be permitted to offer photographic and other evidence depicting conditions of Defendant's other hog operations in their populated states. Plaintiffs emphasize that such photographic evidence is demonstratively admissible regardless, and given the proper foundation, such evidence was admissible in the first three trials. Here, Plaintiffs specifically request that they be permitted to offer photographs and other evidence of conditions at Greenwood 1 and 2, Kinlaw, and Sholar. All of these facilities are similar to Crooked Run in that they involve "1224"[67] buildings designed by Defendant's predecessor companies; are Smithfield feeder-to-finish operations; utilize the lagoon and sprayfield system with pump and reel applicators; have similar histories of lagoon violations; have similar feeders, flush tank waste systems, partially slatted floors, passive ventilation, and center aisles; are populated with Defendant's hogs; are located in the same area of eastern North Carolina; and are subject to the same standard operating procedures and state permit.[68] As the Court is well-aware from the four previous trials, Defendant's operations are located some distance from public roads and behind no-trespassing signs. Accordingly, no

[66] Defendant has provided no indication in its discovery responses that it took any steps to preserve evidence of Crooked Run its populated state.
[67] *I.e*., buildings designed to hold 1224 hogs.
[68] For evidence of similarities across operations, *See* **Exhibit 24**, Excerpts of Rogers report.

one unassociated with Defendant has access to the facilities. No one can have a visual impression of the conditions therein without photographs and other evidence depicting those conditions. As such, this evidence is vital to Plaintiffs' presentation of their claims.

In a case involving similar circumstances, one Federal District Court presented the spoliator—there, the plaintiff—with a choice. *See PacifiCorp*., 879 F. Supp. 2d at 1197. The court permitted the non-spoliator to offer "secondary evidence" in the form of records of an industrial scrubber's deficient performance after the spoliator had scrapped and sold the scrubber itself. The court then held that if the spoliator wished to challenge the accuracy of those records as "secondary evidence," the court would give an adverse spoliation presumption. However, if the spoliator refrained from undermining the secondary evidence per the records, the Court would conclude that the secondary evidence was sufficient to avoid spoliation sanctions. *Id*. ("I leave PacifiCorp with an unpleasant choice. If at trial PacifiCorp attacks the accuracy of the scrubber records, I will conclude that GTN suffered prejudice from the sale of the scrubber and give an adverse inference instruction along the lines of that requested by GTN.").

Plaintiffs request the same relief here. Plaintiffs should be permitted to offer photographs and other evidence depicting conditions at Defendant's other populated facilities—*i.e*., "secondary evidence." If Defendant challenges the accuracy of that evidence, the Court should give an adverse spoliation presumption. On the other hand, if Defendant refrains from undermining Plaintiffs' secondary evidence, Defendant may be able to avoid spoliation sanctions.

Plaintiffs anticipate that Defendant may argue that Plaintiffs had an opportunity to inspect Crooked Run in December 2016 and document its conditions but did not do so. But again, the meaningfulness of a site inspection of a depopulated Crooked Run would have been marginal at best. Based on Butler's and Montgomery's deposition testimony—as well as the information provided by Defendant—Plaintiffs reasonably relied on representations that repopulation of Crooked Run was but a formality upon the completion of a short list of routine maintenance items. Those representations were made in Defendant's presence, and Plaintiffs reasonably relied on them in deferring a Crooked Run inspection pending its repopulation and the uncertainty of whether any cases involving Crooked Run would ever be tried.

Alternatively, to the extent any question remains whether Defendant knew or reasonably should have known that the destroyed evidence of conditions at a populated Crooked Run might be relevant to the litigation at the time Defendant depopulated Crooked Run, Plaintiffs request that they be permitted to present the issue of spoliation to the jury for adjudication. *See Bel Air Mart v. Arnold Cleaners, Inc*., No. 2:10-CV-02392-MCE, 2014 WL 763185, at *5–6 (E.D. Cal. Feb. 21, 2014) ("[I]t will be up to the jury to determine whether Bel Air had an obligation to preserve evidence and, if the jury makes such a finding, it will then be entitled to draw an adverse inference against that party."); *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) (noting that where district court could not rule out possibility that reasonable jury would find that spoliation occurred, veracity of party's reasons for destroying evidence "is an issue of credibility best left for trial"); *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1322 (11th Cir. 2011) (Korman, J., dissenting) (noting that "[a] factual finding of spoliation is necessary only where the district judge seeks to impose a particular sanction beyond submitting the issue to the jury"); *Glover v. BIC Corp*., 6 F.3d 1318, 1332 (9th Cir. 1993) (noting that the district court properly submitted all the evidence to the jury concerning the alleged spoliation of evidence).

**B. There is "good cause" to allow Plaintiffs to take focused and limited discovery regarding Butler's March 26, 2017 correspondence to the NC DENR/DWR and the January 28, 2017 Crooked Run transaction described by Defendant as involving a "Deed of Trust, Promissory Note, Unconditional Guarantee and Security Agreement" and apparent ownership change.**

The Court may modify a scheduling order where there is "good cause." Fed. R. Civ. P. 16(b)(4). In determining whether a motion to reopen discovery satisfied this "good cause" requirement, a court should consider the following factors:

> (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that discovery will lead to relevant evidence.

*In re Rail Freight Fuel Surcharge Antitrust Litig*., 281 F.R.D. 12, 14 (D.D.C. 2011) (quoting *Childers v. Slater*, 197 F.R.D. 185, 187–88 (D.D.C. 2000)). In determining whether there is good cause to reopen discovery, a court should particularly focus on whether the movant was diligent in obtaining discovery. *Id*.

Plaintiffs seeks to reopen discovery for the limited purpose of obtaining evidence concerning Butler's March 26, 2017 correspondence to the NC DENR/DWR addressing the notice of violation for failure to maintain lagoon waste level not to exceed the maximum level. Again, Plaintiffs were made aware of this correspondence for the first time on January 22, 2019 when they received it from the DENR, and the correspondence itself raises concerns regarding: (1) Defendant's encouragement of growers to violate applicable environmental regulations to benefit Defendant in this litigation; (2) Defendant's attempts to create artificial conditions during their "odor monitoring" and Plaintiffs' sampling and site inspections; (3) Butler's apparent belief that the DENR would be compelled by such a justification for failing to comply with applicable environmental regulations; and (4) why Crooked Run's lagoon exceeded the maximum allowable level five months after it had ceased to house hogs.

Plaintiffs further seek to reopen discovery for limited purpose of obtaining evidence concerning the January 28, 2017 transaction described by Defendant as involving a "Deed of Trust, Promissory Note, Unconditional Guarantee and Security Agreement"[69] relating to Crooked Run. As the Court will recall, one of the permeating issues in these cases is the level of Defendant's knowledge and control, depending on whether the facility at issue is grower- or company-owned.

The Court will further recall that counsel for the growers has previously insisted that third-parties have no duty to supplement discovery in response to subpoenas. Accordingly, the ownership of Crooked Run—and chronology thereof—is very much in play. More to the point, if Defendant became the owner of Crooked Run in July 2017—or gained an ownership or financial interest in it – Rule 26(e)(1)(A) required Defendant—"a party"—to supplement its discovery responses "in a timely manner" because Defendant's prior discovery responses were rendered "incomplete or incorrect" in "some material respect" by Crooked Run's ownership change. *See* Fed. R. Civ. P. 26(e)(1)(A). Waiting 19 months until the eve of the pretrial disclosures deadline is clearly not supplementation "in a timely manner."

---

[69] *See* **Ex. 4**, Fourth Amended DFS No. 27.

Accordingly, there is good cause under Rule 16(b)(4). In light of the delay in the fifth trial as a result of the government shutdown, the *Anderson* trials are not imminent. Further, although the request is opposed, Plaintiffs have been diligent in obtaining discovery and filed their motion within days of learning the facts at issue. With respect to the ownership of Crooked Run specifically, the Pender County real property records reflect that Butler and Montgomery—through their entity Bandit 3—still own Crooked Run.[70] Thus, even if Plaintiffs had been on some sort of inquiry notice prior to January 22, 2019, which they were not, Plaintiff had no reason to conduct further investigation into Crooked Run's ownership until facts came to light on July 22, 2019. Furthermore, for the reasons discussed above, discovery is likely to lead to relevant evidence. *See In re Rail Freight*, 281 F.R.D. at 14.

In sum, the facts newly discovered by Plaintiffs shortly before the filing of the instant motion came to light after the discovery had closed, and the parties did not have an opportunity to fully develop the record on these issues—issues that are central to this case. Accordingly, there is "good cause" to allow Plaintiffs to take focused and limited discovery regarding the issues identified herein.

## **CONCLUSION**

In light of Defendant's destruction of and failure to preserve evidence of conditions at Crooked Run in its populated state, Plaintiffs respectfully request that the Court permit Plaintiffs to offer photographs and other evidence depicting conditions present at Defendants' other facilities in this case as described herein. Plaintiffs further request that if Defendant attempts to undermine that evidence as accurately depicting conditions at Crooked Run in its populated state, then the Court should provide an adverse jury instruction permitting the jury to draw an inference that the destroyed evidence of Crooked Run its populated state would have been adverse to Defendant. Plaintiffs further request that the Court re-open discovery regarding the specific matters set forth herein. Plaintiffs request such other and further relief to which they may be entitled.

[70] *See* **Exhibit 25,** Pender County GIS records for Crooked Run as of January 23, 2019.

Respectfully submitted this 28th day of January, 2019.

Counsel for Plaintiffs:

s/John Hughes
Mona Lisa Wallace
N.C. State Bar No. 9021
John Hughes
N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

Michael Kaeske
Texas State Bar No. 00794061
Lynn Bradshaw
Texas State Bar No. 02834500
Eric Manchin
Texas State Bar No. 24013094
(*All By Special Appearance*)
Kaeske Law Firm
1301 W. 25th Street, Suite 406
Austin, Texas 78705
Telephone: (512) 366-7300
Facsimile: 1(877) 826-1221
Email: mkaeske@kaeskelaw.com
Email: lbradshaw@kaeskelaw.com
Email: emanchin@kaeskelaw.com
*By Special Appearance*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that on the 29th day of January, 2019, I served this document via CM/ECF electronic filing system which will effectuate service on every counsel of record.

This the 29th day of January, 2019.


By: s/John Hughes
Mona Lisa Wallace
N.C. State Bar No. 9021
John Hughes
N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

**EXHIBITS:**

**Exhibit 1**, Transcript of June 27, 2018 Hearing on "Motion Filed by Plaintiffs for Discovery and Further Relief Pertaining to Late Produced Documents"
**Exhibit 2**, letter from Matt Butler, owner of Crooked Run, to NC DEQ
**Exhibit 3**, correspondence between Plaintiffs' counsel and DEQ
**Exhibit 4**, Fourth Amended Defendant Fact Sheet for Crooked Run
**Exhibit 5,** Excerpts of Matt Butler's November 8, 2016 deposition
**Exhibit 6,** Excerpts of Robbie Montgomery's November 8, 2016 deposition
**Exhibit 7,** December 2, 2014 audit by Defendant of Crooked Run
**Exhibit 8**, Defendant's list of repairs needed at Crooked Run; Email from Robbie Montgomery documenting problems at Crooked Run; October 18, 2013 audit by Defendant of Crooked Run; March 27, 2014 Notice of Violation; and February 16, 2017 Notice of Violation.
**Exhibit 9,** Crooked Run numbers
**Exhibit 10,** Series of emails between Plaintiffs' counsel and Defense counsel re: site visits
**Exhibit 11**, Rogers declaration
**Exhibit 12**, Rogers' July 13, 2018 trial testimony
**Exhibit 13**, Excerpt of Rogers report
**Exhibit 14**, Excerpts of Paul Stanley's August 26, 2016 deposition
**Exhibit 15,** *Artis* Plaintiffs' trial exhibit 1116
**Exhibit 16**, letter from Plaintiffs to Defendant requesting supplement
**Exhibit 17**, letter from Plaintiffs to grower counsel requesting supplement
**Exhibit 18**, letter from Defendant to Plaintiffs denying supplement
**Exhibit 19**, letter from grower counsel to Plaintiffs denying supplement
**Exhibit 20,** Feb. 13, 2018 "File Access Record" from Yates, McLamb and Wegher LLP to DWR
**Exhibit 21**, Contract between Defendant and Robbie Montgomery
**Exhibit 22**, Prelitigation mediation request
**Exhibit 23**, Wake County complaint
**Exhibit 24**, Excerpts of Rogers report
**Exhibit 25,** Pender County GIS records for Crooked Run as of January 23, 2019